DETERMINED IN THE

# FIRST DEPARTMENT,

AT

## GENERAL TERM,

### September,* 1887.

---

## THE PEOPLE OF THE STATE OF NEW YORK, Respondents, *v.* JACOB SHARP, Appellant.

*Witness—when his testimony should be received, although he is shown to have previously testified falsely—when the conversations of parties are admissible as being negotiations tending to an unlawful agreement — bribery — evidence to show the interest and desire of the party accused, in obtaining the privilege granted, admissible — evidence establishing the commission of another crime, when admissible — prosecution for bribery — article 1, section 6, and article 15, section 2 of the Constitution — under what circumstances witnesses are deprived of the privilege of refusing to answer criminating questions — Penal Code, sec. 79, not applicable to investigations conducted by a committee of either house of the legislature — criminating answers voluntarily made by a witness may be given in evidence against him — possession by the bribed of the same character of money shortly before in the possession of the briber may be shown — confederation of several to commit a criminal act — acts and statements of one are admissible against the others — right of the prosecution to prove the absence of persons accused, as an excuse for not calling them as witnesses.*

The defendant was tried upon an indictment charging him and five other persons with the commission of the crime of bribery by offering and giving, and causing to be given, to one Ludolph A. Fullgraff, then an alderman and member of the board of aldermen of the city of New York, the sum of $20,000 in money, and a promise and agreement therefor, with intent to influence him in his acts, votes and proceedings in the exercise of his powers and functions as a member of the common council, upon and concerning the petition of the Broadway Surface Railroad Company for the consent and permission of the common council to lay down and operate its railroad through Broadway.

---

* Extraordinary General Term convened by proclamation of the Governor.

To prove this charge Fulgraff was called by the prosecution and testified to a combination, or association, having been formed by thirteen of the twenty-four aldermen of the city to exact the sum of $500,000 from the parties or company which should apply to the board for its consent and permission to construct a surface railway through Broadway; that it was stated to the associates that the Broadway Surface Railroad Company had offered to pay that amount, and to at least one of them that the money had been actually put up; that the associates concluded to accept the offer, and that, with that understanding, the board of aldermen passed, over the veto of, the mayor, a resolution, giving to that company the right to so construct the road in that street. Upon his cross-examination it was proved that he was sworn as a witness in an investigation, made in the early part of the year 1886 by a senatorial committee, for the purpose of discovering the facts involved in general charges of bribery made concerning the permission and consent obtained for the construction of this railroad, and that he then denied the existence of this agreement between himself and his associates, and denied having received any sum of money whatever, either to influence or induce him to vote as a member of the board of aldermen for giving the permission and consent.

*Held,* that a claim made by the defendant that the jury should not be allowed to consider the testimony of the witness, as in any manner tending to establish the offense charged, could not be sustained. (Pages 467, 486.)

That the fact that the witness willfully testified falsely before the senatorial committee, did not require his evidence to be excluded from the consideration of the jury. (Pages 468, etc.)

*Dunn* v. *People* (29 N. Y., 522); *Deering* v. *Metcalf* (74 id., 501); *People* v. *Reavey* (38 Hun, 418) followed.

The evidence given on the trial in this case considered by the court, and held to be sufficient to justify the court in submitting the same to the jury for its consideration. (Pages 472, 478.)

That statements made by these aldermen at their meeting were properly received, as they were not mere conversations between the aldermen, but were negotiations and arrangements by which a definite understanding and agreement was reached as to what the vote on the petition and the amount of the exaction should be, and tended to establish the agreement through and under which Fullgraff was to receive the money mentioned in the indictment. (Page 479.)

That an objection to the admission of the statement made by one of the aldermen to Fullgraff, that the money had been put up, was properly overruled as it was important information communicated to Fullgraff by one of the members and had a material relation to, and was explanatory of, their subsequent action. (Pages 478, 507.)

To prove the concurrence or confederation of the defendant in the offense, evidence was given tending to prove that he had, for at least thirty years, been anxious to acquire and operate the right to construct and operate a railroad through Broadway; that he was interested in two companies, one of which, at least, would be vitally benefited by the acquisition of this right, and very greatly injured if it should be granted to any other company.

In 1883 the defendant employed counsel to oppose that provision of a general surface railroad bill, then before the legislature, which excluded Broadway from the streets in New York upon which such a railroad could be constructed. Upon the trial of the defendant, one Pottle, an engrossing clerk, was allowed to testify that after the bill had passed the senate and assembly, and was in his hands, the defendant offered him the sum of $5,000 to add to the bill the words "Broadway and Fifth avenue;" and that when the witness declined to do so the defendant offered him the same amount if he would give him the original bill which had then passed both houses.

*Held,* that an objection to the admission of the evidence, based upon the ground that it tended to establish the commission of another crime by the defendant, was properly overruled. (Pages 482–514.)

That while the evidence did tend to establish the commission of another crime by the defendant, it had also a tendency to establish the crime charged against him by the indictment, and the intense interest which he had in the building of the Broadway Surface Railroad, and was also direct evidence sustaining the probability that he would be willing to purchase the right to construct the road, as it was alleged he did, before he would be defeated or frustrated in accomplishing the end he had in view. (Pages 473, 482.)

*People* v. *Shulman* (80 N. Y., 373, note); *Mayer* v. *People* (Id., 364); *People* v. *O'Sullivan* (104 N. Y., 481); *Weed* v. *People* (56 id., 628); *Commonwealth* v. *Bradford* (126 Mass., 42) and *Commonwealth* v. *McCarthy* (119 id., 354) followed.

*Held,* further, that — as the defense claimed that even if the jury should find that money was paid to Fullgraff, yet, as it was paid after the services had been rendered, and as Fullgraff had publicly declared his intention to vote for the measure, a corrupt purpose could not be inferred — it was admissible to rebut this claim and establish the intent with which the defendant acted in his payments of money to public officers by showing other acts of the defendant done by him in furtherance of this same general scheme which were inconsistent with an innocent intent.

The rule admitting evidence of other criminal transactions is subject to the qualification that it shall be so far limited and restricted by the court as to leave the jury only at liberty to use it to discover the motive or intent actuating the accused. (Page 484.)

Upon the trial, evidence showing the answers made by the defendant on his examination before the senatorial committee was, against his objection and exception, admitted, these answers tended to establish the fact that he had untruthfully answered questions put to him, and that instead of disclosing, as it was reasonable to assume he had the ability of doing, what he had done with a large amount of money which had passed through his hands during the period referred to in the indictment, he denied having any recollection of their disposition.

*Held,* that the court properly overruled an objection that the admission of the evidence was a violation of the provisions of section 6 of article 1 of the Constitution, declaring that no person shall be compelled in any criminal case to be a witness against himself. (Page 486.)

That the answers given before the senatorial committee were not compulsorily extorted from the defendant, but were all voluntarily given by him; no objec-

tion being made that he could not answer them without his answers having a tendency to criminate him, and no ruling having been made by the committee that he must give such answers. (Page 486.)

That section 2 of article 15 of the Constitution, declaring that no person offering a bribe shall, upon any prosecution of the officer for receiving such bribe, be privileged from testifying in relation thereto, and that he shall not be liable to civil or criminal prosecution therefor if he shall testify to the giving or offering of such bribe, had no application to this case, as the privilege of refusing to answer is not taken from the witness, unless he is called upon to testify in a proceeding relating to the prosecution of an officer for receiving a bribe, and has testified to the giving or offering such bribe, neither of which facts existed in this case. (Pages 488, 515.)

It was claimed that the failure of the defendant to object or claim his privilege before the senatorial committee did not render his answers voluntary, for the reason that he was acting under the mandate of a compulsory statute.

The statute relied on was section 79 of the Penal Code, which declared that any person offending against any provision of that Code relating to bribery should be a competent witness against another person so offending, and might " be compelled to attend and testify upon any trial, hearing, proceeding or *investigation*, in the same manner as any other person," and that the testimony so given should not be used in any prosecution or proceeding, civil or criminal, against the person so testifying.

*Held*, that the connection in which the word "investigation" was used in this section showed that it was designed to relate exclusively to proceedings in court, or before a committing officer, and that it did not include the investigation in which the committee of the senate was engaged. (Pages 487–489.)

That the word " investigation " was intended to include only a trial, hearing or proceeding upon a particular charge, including investigations before a grand jury, or before committing magistrates or coroners, and was not used independently to include a different or distinct class of investigations by other bodies or persons. (Page 490.)

That the presumption that the legislature did not intend to provide in this section (79) for investigations by either house of the legislature, or any committee thereof, was strengthened by the fact that provisions, for investigations of that kind, are expressly provided for by sections 68 and 69 of the same Code. (Pages 491–515.)

Section 69 of the Penal Code reads as follows: " A person who, being present before either house of the legislature, or any committee thereof authorized to summon witnesses, willfully refuses to be sworn or affirmed, or to answer *any material* or *proper question*, or to produce, upon reasonable notice, any material and proper books, papers or documents in his possession or under his control, is guilty of a misdemeanor."

*Held*, that this section did not require a person appearing before a legislative committee to answer questions criminating himself, or having a tendency to produce that effect; nor did it exempt him from the use of his answers, made before such committee, against him in any future criminal proceedings. (Page 491.)

That, as the section contained no provision declaring that the evidence given by him should not be afterwards used against him, it should not be construed as intended to deprive him of his constitutional right to refuse to answer such questions. (Page 492.)

*People ex rel. Hackley* v. *Kelly* (24 N. Y., 74, 83); *Emery's Case* (107 Mass., 172) followed.

That, as the defendant appeared before the committee and voluntarily answered the questions put to him, the answers then given by him were admissible against him upon his trial upon the indictment. (Page 494.)

*Hendrickson* v. *People* (10 N. Y., 13).

Upon the trial evidence was given tending to show that the $500,000, paid to the aldermen to obtain their consent to the construction of the railroad, was obtained by the sale of bonds issued by the Broadway and Seventh Avenue Railroad Company, which was vitally interested in obtaining the privilege for the Broadway Surface Company, secured by a mortgage upon its property; that, in negotiating the bonds, checks were declined and the money obtained in large bills of the denomination of thousands, five hundreds, hundreds and fifties. Upon the trial the court admitted evidence showing that, after the common council had acted upon and granted the application, large bills of the denominations named and two gold certificates, one for $1,000 and the other for $5,000, were in the possession of some of the aldermen.

*Held*, that as the evidence tended to establish the probable relation between the money in the hands of these different aldermen and the large bills that were obtained upon the sale of the $500,000 in bonds, and also to establish the fact that there was concert of action between these different persons and the persons making the sale of the bonds and disposing of the money for distribution, it was within the well established rule of law permitting the facts to be laid before the jury as having some probable connection with the charge contained in the indictment. (Pages 470–475, 480, 496–500, 501, 509, 512.)

Where there is probable confederacy of action between different individuals in the commission of a crime, some performing one act, others another, to carry into effect, what may appear to be, a concert of action resulting in the crime, that which each person in the promotion of the common enterprise may say or do is admissible against the others. (Pages 497–507.)

It is not important whether it be alleged in the form of a conspiracy between the persons charged or a mere confederacy or concert of action. The test is whether the parties charged were probably co-operating together to bring about a particular criminal result; and when that probability has been reasonably well established evidence may be received of their acts and statements contributing to that end. (Page 497.)

*Kelly* v. *People* (55 N. Y., 565); *Place* v. *Minster* (65 id., 89); *State* v. *Winner* (17 Kan., 298) followed.

In the course of the trial the prosecution were allowed to prove that Maloney, Keenan, De Lacy, Dempsey and Sayles, who were supposed to have been parties to the bribery, were in Canada, upon the statement of the district attorney that the object of the proof was only to show their absence from

the State and his consequent inability to produce them as witnesses upon the trial.

*Held,* that the court did not err in receiving the evidence. (Page 499.)

*Held,* further, that as the defendant's counsel had opened the door to such proof by previously proving, on the cross-examination of Fullgraff, that De Lacy was in Canada, they could not well object that the district attorney gave additional evidence on the same subject, relating the four other persons. (Pages 499, 500.)

APPEAL from a judgment of the Court of Oyer and Terminer, held in the city and county of New York, convicting the defendant of the crime of bribery, and from orders denying motions for a new trial and in arrest of judgment.

*W. Bourke Cochran, Albert Stickney* and *John E. Parsons,* for the appellant.

*Randolph B. Martine, De Lancey Nicoll* and *Mackenzie Semple,* for the respondent.

DANIELS, J. :

The charge contained in the indictment arose out of transactions, alleged to have taken place, to obtain the consent of the common council of the city of New York to the construction and operation of a surface street railroad on Broadway, between the Battery and Fifteenth street. The Broadway Surface Railroad Company was organized and incorporated under chapter 252 of the Laws of 1884. This law was enacted and went into effect on the 6th of May, 1884, and the Broadway Surface Railroad Company was incorporated under it. The act was passed by the legislature under the amendments made to the Constitution of the State, taking effect on the 1st of January, 1875, which prohibited the construction of street railways without the consent of the local authorities having the control of the portion of the street or highway on which it should be proposed to construct and operate the railroad. The common council of the city of New York was the body having such control over the street; and under the authority of section 3 of this act, that body, subject to the power possessed by the mayor to veto ordinances, was declared to be the local authority to give such consent.

The indictment charged the defendant and five other persons with the commission of the crime of bribery, by offering and giving

and causing to be given to one Ludolph A. Fullgraff, then an alderman and member of the board of aldermen of the city of New York, the sum of $20,000 in money and a promise and agreement therefor, with intent to influence him in his acts, votes and proceedings in the exercise of his powers and functions as a member of the common council upon and concerning the petition of the railroad company for the consent and permission of the common council to lay down and operate its railroad through Broadway. Objections seem to have been taken to the sufficiency of the indictment, but its charges are clearly and explicitly made, and disclose a violation by this alderman and the defendants named in the indictment, of the statute of the State defining the crime of bribery. Concerning its sufficiency, no serious grounds of complaint were urged upon the argument of the appeals; but the objections pressed upon the court, and which have been presented and answered with signal clearness and ability, relate to the sufficiency of the evidence given to prove the allegations in the indictment, the admissibility of important parts of such evidence, and the disposition which was made by the court of legal propositions presented to it in the charge given to the jury. These are the important subjects requiring consideration for the decision of the appeals, and the first in order, and equally, if not more important than either of the others, is the objection so earnestly made that the case, under the evidence, should not have been submitted to the consideration of the jury.

To prove this part of the case, so far as to render it the subject of consideration by the jury, Ludolph A. Fullgraff, the alderman named in the indictment, was placed on the stand as a witness for the prosecution, and he testified to a combination or association having been formed by thirteen of the twenty-four aldermen of the city, to exact money from the parties or company which, it was anticipated, would apply to the board for its consent and permission to construct this railway. Meetings were held to promote this object, commencing the latter part of the month of May after the passage of this act. These meetings were four in number, and it was stated by the witness that it was agreed between himself and the other associate aldermen that consent should only be given for the construction of the railroad through the street for the sum of $500,000 in cash. It was stated, for the information of the associates,

that the Broadway Surface Railroad Company, which had then become a corporation, was willing to pay that amount for the right to construct and operate its road through this street. This was stated to the associates as an offer the company had made, and it was concluded among them to accept this offer; and before action was taken upon the petition of the railroad company for the permission, it was stated to them by at least one of the same persons, that this sum of money had actually been put up. And the further evidence of the witness was that it was with that understanding, on the 6th of August, 1884, that the board of aldermen adopted the report of its committee, giving this consent to this railroad company. It was an essential fact in support of the prosecution that this evidence should be adopted and followed by the jury in the disposition of the indictment. Without it no case existed against the defendant or his associates. But with this fact established to the satisfaction of the jury, and the further circumstance in like manner proved that the defendant, either by himself or in co-operation with the other persons named in the indictment, raised this sum of money and appropriated and paid it for this unlawful purpose, his guilt would be made out.

To meet this evidence, and to overthrow the credit of the witness giving it, it was proved, upon his cross-examination, that he was sworn as a witness in an investigation made in the early part of the year 1886 by a senatorial committee for the purpose of discovering the facts involved in general charges of bribery made concerning the permission and consent obtained for the construction of this railroad. In his examination on that occasion he denied the existance of this agreement between himself and his associates, and denied having received any sum of money whatever, either to influence or induce him to vote, as a member of the board of aldermen, for this permission and consent, and as the facts were all at that time as well known to him as they were stated to be upon the trial of the defendant, he then swore willfully false if his evidence upon this trial was truthfully given. And upon that circumstance, as well as other contradictions which were explained by the witness to have originated out of mistakes, it was urged, in behalf of the defendant, that the jury were not at liberty to consider the testimony of this witness as in any manner tending to establish the offense

charged in the indictment. But it does not follow from the fact that the witness testified willfully false before the senatorial committee that the defendant's counsel were right in asking that his evidence should be excluded from the consideration of the jury. This subject was considered by the court in *Dunn* v. *People* (29 N. Y., 522), and each of the judges who delivered opinions in that case arrived at the conclusion that the jury were still at liberty to consider the evidence of such a witness, notwithstanding the fact of his having sworn falsely concerning the same subject upon a preceding examination. In referring to this subject, DENIO, Ch. J., stated that "the true question is whether, when it appears that the witness has sworn differently upon the same point on a former occasion, he is to be pronounced by the judge to be incompetent, and his testimony stricken out and wholly excluded from consideration, as though he had been convicted of a crime, rendering him incompetent to testify as a witness, or whether the testimony remains in the case to be considered by the jury in connection with the other evidence under such prudential instructions as may be given by the court, and subject to the determination of the court having a jurisdiction to grant new trials in cases of verdicts against evidence. In my opinion, the latter is the correct principle of law." (Id., 529.) And as this was assented to by INGRAHAM, J., who delivered the other opinion, and by all the other judges of the court, it seems to be sufficient to establish it as the principle which should be followed under this state of facts on the trial of an indictment. The same point was further examined in *Deering* v. *Metcalf* (74 N. Y., 501), where the cases were fully considered and the disposition of the court appeared to be to follow the principle which has just been stated, and not that in general terms announced in *Dunlop* v. *Patterson* (5 Cow., 243). Further consideration was given to this subject in *People* v. *Reavey* (38 Hun, 418), where the same rule was followed, and as that case has been affirmed by the Court of Appeals it is in the nature of a conclusive authority against the defendant on the proposition urged in his behalf.

Previous to the enactment of this Code of Civil Procedure it was provided by statute that if a person should be convicted of the crime of perjury he should not thereafter be received as a witness to be sworn in any matter or cause whatever, until the judgment

against him should be reversed. (2 R. S. [2d ed.], 567, § 1, sub. 3.) This legislation proceeded upon the understanding that in the absence of such a conviction the evidence of the witness might be taken, and a much broader principle than that, applicable to this subject, has been now adopted by section 832 of the Code of Civil Procedure, for that has provided that a person who has been convicted of a crime, which will include that of perjury, is, notwithstanding the conviction, a competent witness in a civil or criminal action or special proceeding, but his conviction may be proved for the purpose of affecting the weight of his testimony, either by the record or by his own cross-examination. This section necessarily repealed and abrogated the provision already quoted from the preceding statutes, and it has restored the competency of a person as a witness who before was incompetent by reason of his conviction of a felonious criminal offense. And as a person previously convicted has been in this manner declared to be competent as a witness, it follows from the enactment that he cannot be held incompetent because of the commission of this crime, when no conviction, as a matter of fact, has taken place. It would be little less than absurd to hold a witness to be incompetent, or to require his testimony to be excluded from the consideration of the jury, where he had been convicted of no criminal offense, and to hold him competent in case such a conviction had taken place. The theory and principle on which this enactment was made is that in the absence of a criminal conviction the evidence of the person is entitled to be taken and submitted to the consideration of the jury, and this enactment was introduced for the sole purpose of rendering a person who had in fact been convicted equally competent with the other as a witness. The position taken in behalf of the defendant, that the evidence of this witness should have been withdrawn from the consideration of the jury, is accordingly considered to be incapable of being legally supported.

In the testimony given by him before the senatorial committee he had a strong motive for his own protection, inducing him to make this false statement. No disclosure had then been made by either of his associates concerning the combination stated to have been made between them, or of the money which had been received inducing and rewarding their action. At that time they stood

together affirming their innocence of the charges made against them and other members of the board of aldermen; and it was not unt1 a disclosure by one of their number had taken place of their misconduct that he concluded to retract the evidence he had given and to give the testimony which he did upon this trial and, with some discrepancies, upon two preceding trials. This state of facts presents a probability at least in favor of the truth of his evidence, for the motive which would naturally impress itself upon his mind would be to conceal the offense he and the associate aldermen had agreed to and, in fact, did commit; and the strength of that motive, considering the infirmities of human nature, might then well be sufficient to induce him to make a false statement under the obligations and solemnities of an oath. And there is a further probability that in retracting that statement and making one directly different, as this witness did, that he had finally been induced to do so with the design of disclosing the truth.

In the course of his examination he stated the fact to be that the two sums of $5,000, which were paid to him, were paid in large bills; that they were of the denomination of thousands, five hundreds and, he thought, some hundreds and fifties. The last of the meetings, the witness testified, took place in October, and the first payment of $5,000 was received by him shortly after that time, and in January or February he received the other sum of $5,000. Early in February of the same year he loaned the sum of $8,000 to a friend of his engaged in and carrying on business on Fulton street in the city of New York, and in making that loan testified that he paid out these large bills. The business was stated by him to have been transacted on behalf of the firm of Reed & Carnrick by Thomas B. Brown, who was in their employment; and the testimony of Brown as a witness was that the bills which were received were large bills, mostly of the denomination of a thousand dollars. This evidence did have a tendency to corroborate the testimony of Fullgraff, and so did the proceedings of the board of aldermen after the information was given that the money had been put up and awaited for its distribution the action to be taken on the petition of the railroad company. Those proceedings characterized the conduct of the witness and his associates, and at least some others acting with them, as that of men who had been unlawfully influ-

enced. The hearing preceding the passage of the resolution on the sixth of August was formal and without effect in the way of delaying the consummation of the proceeding, and so was the action of these members of the board, in what was done after the resolution was vetoed, as it was by the mayor on the eighteenth of the same month. That veto prevented the resolution from taking effect and deprived the railroad company of the consent, it, for the time had secured, of constructing and operating its railroad in Broadway, and a suit was then brought in behalf of John H. Lydy against the president and other members of the board of aldermen, restraining them from afterwards granting the desired permission and consent. This suit continued until the twenty-ninth of the same month, when it was settled and discontinued on the payment of $12,500 by a person acting under the authority and employment of the president of the Broadway Surface Railroad Company. Immediately upon that settlement taking place, and in the evening of the same day, a call was circulated and subscribed for a meeting of the board of aldermen on the following morning at the hour of nine o'clock. This was an unusual hour for convening the board, and the notice given for the purpose was entirely unreasonable. For that reason it was held in the General Term of this department, when the application was made for the appointment of commissioners to report as to whether the railroad should be constructed, that the consent and resolution adopted at this meeting was without authority and void. And upon that subject no difference of opinion existed among the judges. Extraordinary means were taken to obtain the attendance of absent persons, one in New London, another on Staten Island, who were friendly to the concession of the right to construct the railroad. And the proceedings, from the manner in which they were set on foot and carried into effect, were entirely inconsistent with any just sense of the obligation that the persons engaged in them were under in the performance of their official duties.

In November the resolution was again adopted, conceding to the company the right to construct and maintain the railroad. This resolution went again before the mayor, and was vetoed by him the same as it had originally been. His vetoes were communicated to the board by messages, accompanied by letters and newspaper articles strongly condemnatory of the action of these aldermen;

and the statement was made to them that the franchise for the street could be sold for the sum of $1,000,000, in addition to the percentages required to be paid to the city by the act of 1884. But notwithstanding all the information given and the arguments made use of, the resolution was finally adopted over the veto of the mayor on the 5th of December, 1884, by a vote of twenty-two to two of the board. These proceedings, as they were disclosed by the evidence upon the trial, were reckless and shameless, and the natural inference from them is that they would not have taken place in the manner in which they did, had it not been for the fact that the testimony of this witness Fullgraff was substantially true as he gave it upon the trial. Certainly the tendency of these facts, as well as the evidence given by the witness Brown, was sufficient to justify the court in holding that the evidence of Fullgraff was proper to be considered and weighed by the jury. (*People* v. *Jaehne*, 103 N. Y., 182.) And if they found it to be truthful, as under the circumstances they very well might, that would support the first important fact required to make out the charge contained in the indictment.

The other and more important fact for the defendant is whether the evidence sufficiently established his concurrence or confederation in this unlawful proceeding, to allow the jury to find the fact against him. To so far prove this fact as to permit the jury to consider the evidence, it was shown that for at least thirty years this defendant had been anxious to acquire the right to construct and operate a railroad through Broadway. He was also interested in two companies, one of which at least would be vitally benefited by this right, and very greatly injured if it should be conceded to some other railroad company. For the object of securing this right he was in Albany during a portion of the session of the legislature in the year 1883. A general surface railroad bill was at that time before the legislature, but in its provisions it excluded from the streets of the city of New York upon which such a railroad could be constructed Broadway and Fifth avenue. In case of its passage in this form, that would have defeated the hopes and desires of this defendant. He accordingly employed counsel to aid and assist him in obtaining such a change in the bill as would exclude Broadway from the exception, and the efforts of the counsel were strenuously

directed to that end. They, however, failed of success, and the bill was passed by the senate and the assembly containing the exception of these streets. The defendant is then stated by the witness Pottle, who was an engrossing clerk of the legislature, to have sent for him, and upon the occasion of the interview afterwards taking place he desired the witness to change the bill in such a manner as was indicated by him, the witness stating the defendant's request to be that Broadway and Fifth avenue should be inserted in the act. The witness declined substantially to make the change, and he was then, it is stated, desired by the defendant to produce the bill and hand it to him, which was also declined, although an offer of a pecuniary reward was at the time made to accomplish either of these results. This evidence tended to establish the intense eagerness of the defendant to secure the passage of the law, or a fabricated change in it so that it would enable him to avail himself of the right to construct a railroad in Broadway. And after he failed in obtaining either result in this manner, counsel was employed by him to appear before the governor and resist the approval of the law by the executive. The counsel so employed directed his efforst and arguments to that end, and they proved to be successful, for the bill was disapproved by the governor. During the next session the act of 1884 was introduced, containing no exception of these streets, as was contained in the bill of 1883, and the defendant interested himself to promote the passage of that act, and for that purpose also employed to aid and assist him the witness Edward R. Phelps, who had contributed to his defeat during the session of 1883. This employment was made under an agreement with Phelps that he should be one of the incorporators in the company afterwards to be formed to construct and operate a railroad in Broadway, and by their joint efforts and the efforts of their counsel the bill was enacted and received the sanction of the governor. But in the organization of the corporation the witness Phelps was not included as a corporator, and was greatly dissatisfied with the proceeding of the defendant resulting in his omission. This, however, was afterwards settled by the defendant with Phelps by paying him the sum of $50,000. These facts, together with others disclosed by the evidence, to which further allusion is not considered necessary, sufficiently sustain the conclusion that the

defendant was willing to resort to extreme as well as unlawful measures to obtain the consent secured by him for the construction of the railroad, and render it probable at least that himself and his associates co-operated with the aldermen favorable to his enterprise in an unlawful manner to bring about the result which was finally secured.

It appeared by the evidence of Fullgraff, that it was at one time proposed, in the meeting of himself and his associates, that the money to be divided between the aldermen voting for the measure, should be placed in the hands of Maloney, who was a reading clerk of the board, and is one of the defendants charged with crime by this indictment. That disposition was not made of the money, but the proposal was evidence of the fact that he was considered to be accessible for carrying out the designs and purposes of the combination. And it was made to appear by the evidence that Maloney, before the vote taken upon the resolution or report of the committee on the 6th of August, 1884, was in the habit of meeting with the defendant and others named in the indictment, at the office where the business of the Broadway Surface Railroad Company was made the subject of attention and consideration. No reason appears explaining the fact of his attendance there, other than the probability that he was acting as the representative of the associated aldermen and conferring with the defendant and his associates, concerning the concession or permission, desired to be secured for the construction of this railroad. The circumstances were such as justly to arouse this suspicion and induce the jury to believe that he visited the meetings of the persons interested in this and the other street railroads, which would be benefited by the Broadway road, to arrange and perfect the terms on which the votes of the majority of the aldermen were to be secured in favor of the defendant's company. This presumption is further extended and matured by the fact proved by the witness, Robert E. Dowling, who, on the 5th of August, 1884, received a paper from the defendant to be taken to the place of meeting of the board of aldermen and there delivered to the defendant Richmond, who was the president of the Broadway Surface Railroad Company, with the injunction: " Don't let anyone see you giving it to him. Give it to Mr. Richmond and tell him to give it to Mr. Maloney." The witness looked at the paper while it was in

his possession and gave such a description of it as left ground for believing that it was the document the aldermen were expected to adopt, giving permission for the construction of this railroad. And such seems to have been the understanding at the time of Mr. Richmond, for he declined to receive it and expressed himself as disapproving the action of the defendant in sending it personally to him, and directed Dowling himself to hand it to Maloney, who was in another room, and that was then done by the witness. These facts are not reconcilable with any other view than that the defendant was engaged in endeavoring to influence these aldermen and to promote and complete his object by the intervention of Maloney.

It further appeared that in the month of July, 1884, the Broadway and Seventh Avenue Railroad Company, which was vitally interested in securing this privilege from the board of aldermen for the Broadway Surface Company, issued a series of bonds secured by a mortgage for the sum of $500,000. The object of that was stated to be, that it would be necessary for this company, in consequence of a contract made with the Broadway Surface Railroad Company, to purchase lands, enlarge its depots and extend its facilities.

An application was made to an engraving firm on the nineteenth day of July to engrave these bonds, and more time was asked by the engravers than the defendant Foshay, who was the president of the Broadway and Seventh Avenue Railroad Company, was willing to allow, and the time was so far reduced at his solicitation as to secure the preparation of the bonds in seven days. These bonds, after they were engraved, were executed by the proper officers of the Seventh Avenue Railroad Company, and were negotiated, together with seventy-five bonds of the Broadway Surface Railroad Company, by an agent employed by the president and treasurer of the Seventh Avenue Railroad Company, and the sum of $500,000 was raised upon them. In negotiating the bonds checks were declined and the money was obtained in large bills, many of them similar to the denominations mentioned by the witnesses Fullgraff and Miller. This sum of money was, in this manner, secured before the action taken by the board of aldermen in the early part of August, 1884. And the fact that Fullgraff and other aldermen appeared to have bills in their possession corresponding with the bills secured from the negotiation of these bonds, was a circumstance certainly tending

to create the conviction that the money received for them went afterwards into the hands of the aldermen conforming their action to the desires and wishes of the defendant. This inference is also strongly maintained by the fact that no part of the money raised upon the bonds appeared to have been used in the purchase of lands, or in enlarging the depots, or extending the facilities of the Seventh Avenue Railroad Company. And the fact that the defendant himself gave no account of about $400,000 that went into his hands when he was examined before the senatorial committee has a very decided tendency, to say the least, in the same direction. For if he had used the money in any lawful enterprise it is incredible to suppose that he would not at that time have been willing to give a substantial account at least of what he had done with it. A further fact confirmatory of the same view was the circumstance that the defendant himself proposed to a meeting of the board of directors of the Broadway Surface Railroad Company to construct and equip the railroad and pay all the expenses incurred or to be incurred, in consideration of all the bonds and all the stock of the company. That was accepted by a vote of the directors, who acted without inquiry or discussion, as the board of directors of the Seventh Avenue Railroad Company did in resolving upon the issue of the the series of $500,000 in bonds on which that amount of money was raised. The stock of the Broadway Surface Railroad Company consisted of 10,000 shares of $100 each share, and under this resolution 9,520 shares were passed over to the defendant. And so were two series of mortgage bonds upon the railroad and property of the company, the first amounting to the sum of $1,500,000, and the second to the sum of $1,000,000. These shares and bonds were received by him in consideration of his proposal to construct the railroad for a distance of probably less than, and certainly not exceeding, three miles. The evidence given upon the trial tended to establish the fact that but a very small part of the money represented by these shares of stock and these bonds would be required to construct, equip and maintain the road and pay the expenses mentioned in the proposal. But they were all conceded and turned over to the defendant, practically giving to him, as the evidence probably indicated, four-fifths of their amount beyond any consideration whatever being received by the company. This circum-

stance tended to show the fact to be that he was the prime mover in all the proceedings which have been mentioned, and determined to accomplish a favorable result without reference to the means which might be employed to bring about that end. But the evidence afforded by these facts against him tending to complicate him with the action of these aldermen in raising and paying to them the precise amount of money which they required, did not stop here, for after the action of the board on the 6th of August, 1884, a conversation is stated to have taken place between himself and the witness, George V. Powell, who had previously been in the employment of the company, endeavoring to obtain the consent of the property owners to the construction of the railroad.

This witness states that the fact of the mayor having vetoed the favorable resolution which had already been passed by the board, was mentioned in their conversation, and that in that conversation it was, in substance, stated by the defendant that this final resolution would be passed over the mayor's veto for the reason that the defendant had the aldermen fixed. There was some but no very great discrepency between this statement of this witness and the evidence given by him before the senatorial committee, consisting as it was stated, in the omission to use the word "fixed" his statement there being that the defendant informed him that it made no difference, it would be passed over his, the mayor's veto. Upon further examination of the witness, however, he testified that he recollected that this word "fixed" was used by the defendant, and he was only in doubt as to the manner in which that use was made of it. It was also shown that the defendant personally interested himself in securing the special meeting of the aldermen for the passage of the resolution, on the morning of the thirtieth of August; that in the preceding evening he called upon Pierson, one of the aldermen, and notified him that the board was to meet the next morning at nine o'clock, and requested him to meet Maloney, who had charge of the call at half past eight o'clock, on the corner of Fifth avenue and Twenty-third street, and sign the call, which Pierson states that he did.. The case is not without further evidence, but not so direct and important as that which has been mentioned, indicating the probability that the defendant was instrumental in obtaining the concession of this privilege from the board of aldermen by corrupt

means, and the promise of, and use of, money as the facts were stated in the testimony of Fullgraff.

In the course of the cross-examination of the latter he testified that he voted for the resolution from a sense of duty, and believing that the interests of the public would be promoted by the construction of this railroad, and upon that evidence it has been insisted by the counsel, who have so ably represented the defendant, that the case was not one of bribery, but rather of extortion on the part of the aldermen themselves. But the further testimony of the witness in which he stated that he was influenced in his vote by the promise and expectation of the money which was to be paid, sufficiently met this point to justify its submission to the jury.

Upon the whole case there was evidence as to each material branch of it, which the court could not withhold from the consideration of the jury, and its decision to submit the case as it was to them was fully supported by the law as well as the testimony. The offense charged is one in which the parties concerned in it always seek concealment of their acts and endeavor to avoid discovery and detection, and when it may be made out upon a trial in a court of justice it must be mainly dependent upon circumstances as it was in this insance. These circumstances were such as to point directly to the strong probability that the charge was correctly made, and together with the circumstance that the amount required by the aldermen was precisely the same as that raised by the sale of the bonds warranted the jury in arriving at the conclusion which they did by their verdict.

In the examination of the witness Fullgraff, he was asked whether in June 1884, he made any agreement or promise to vote for the Broadway Surface Railroad Company's petition for a road on Broadway, for money. To that the counsel for the defendant objected on the ground that it was asking the witness whether in fact an offense had, or had not, been committed, and that the question should be directed to a specific conversation or transaction, and that it should be first shown whether the conversation or transaction was had with the defendant or some other person. The court overruled these objections and allowed the evidence to be given, to which an exception was taken, and the witness answered, " I did." While this objection was dwelt upon by the counsel in the argument as an

erroneous ruling of the court it is not necessary to consider whether that was so or not, for the witness was afterwards examined, both on the part of the prosecution and the defense, minutely as to all that was said and done, and the gatherings of the aldermen, their conversations and resolutions were all given with great particularity, and the answer to this question, consequently, could in no manner have prejudiced the defendant in any of his rights.

It was also objected that the statements made in the meetings of these aldermen should not have been received as evidence upon the trial. But these were not mere conversations between the aldermen who were gathered together on these different occasions, but they were negotiations and arrangements by which a definite understanding and agreement was reached as to what the vote should be on the petition of the railroad company, and what consideration they could expect in the way of money to secure such vote. What was proved was evidence to establish the agreement through and under which the witness Fullgraff was to receive the money mentioned in the indictment, and which, according to his testimony, was carried out in the future proceedings of the board of aldermen. It has been urged in this connection that the testimony was received in part at least, if not wholly, under the announcement made by the judge presiding at the trial, that any evidence would be admissible against the defendant that could be received against Fullgraff if he was on trial; and to a certain extent, and, perhaps, as far as the learned justice intended to go, this was a correct ruling, for direct evidence sustaining the charge that Fullgraff had entered into the agreement, which is stated to have been made with his associates to vote in the manner in which he did, was so far evidence against the defendant indirectly, for it tended to make out one of the grounds upon which the indictment rested. To that extent the ruling seems to have been free from objection, and no evidence appears to have been received upon the trial under this ruling beyond that which was appropriate to this object.

It was also objected that the statement made by De Lacy that the money was up should not have been received. But this objection certainly cannot be sustained, for it was important information communicated to Fullgraff by one of their number, having a material relation to and explanatory of the subsequent action. They

had agreed to vote in favor of the concession of the right to lay the railroad through Broadway for this sum of money, and it was important evidence, indicating the inducement to the action of Fullgraff, at least, to prove the fact that he understood, or was informed, that the money had been put in such a position as to be accessible to him after his vote had been given. It was evidence tending to establish the motive by which he acted in the proceedings afterwards before the board of which he was a member. The testimony concerning the conversation with Keenan, one of the defendants in the indictment, was equally admissible, for he was the agent whom it was agreed should hold the money for its future distribution after the promised action of these aldermen should be taken; and it was given to prove the fact only that Keenan was willing to do so, and to act upon the simple assurance that " it was all right." These were integral parts of the transaction through which the aldermen were led to bind themselves by this unlawful agreement to support the application of the Broadway Surface Railroad Company; and it had a direct tendency to indicate the motives by which they were actuated in giving their votes, and that such motives were not the extortion of money from the company but the sale of their votes and influence for this consideration. Besides that these parties were all apparently acting in concert as the case was finally proved to the satisfaction of the jury, and these statements were in the nature of acts and admissible as evidence under the rule establishing the right of the prosecution to prove the acts and declarations of confederates against any one of their number who may be indicted and placed upon trial.

No more need be added as to the admissibility of the evidence of Brown concerning the loan made by Fullgraff to McCarnrick & Reed, for, as that evidence tended to corroborate the testimony of Fullgraff, it was legally received upon the trial. There was a coincidence between the character of the bills which were received by Fullgraff from De Lacy, who appears finally to have acted in the distribution of the money and those used to make the loan, which entitled this evidence to be admitted for the consideration of the jury. It is true that it was in no manner conclusive, but it was a circumstance connected with the others, having a bearing upon the probabilities of the truth of a part of the charge contained in the indictment.

An exception was also taken to the allowance of the evidence given by the witness Phelps concerning the fact that he resisted the passage of the bill for surface street railroads in 1883, and upon an agreement with the defendant, that he should become an incorporator in the Broadway Surface Railroad Company, aided and assisted him in obtaining the passage of the act in 1884. But this evidence had a plain tendency to prove the great eagerness of the defendant for the passage of a law which would enable him, through the means of a corporate organization, to acquire the right to build and operate a railroad in Broadway. It was a subject that he apparently never lost sight of, but constantly directed his mind and his energies to bring it into successful legal existence, and as he was actuated by the same design continuously down to the time when he obtained from the board of aldermen the concession which he did, this evidence was directly connected with the transactions referred to in the indictment, and as such it was admissible as tending to prove the fact that his interest and desire was such as probably to lead him to purchase by the unlawful use of money what he might consider it was doubtful he could obtain in any other manner. The facts to which the evidence of this witness was directed exposed the state of mind by which the defendant was influenced, and within the rule, which will presently be considered, they were clearly admissible against him upon this trial.

Little time is required to be devoted to the consideration of the objections made to the introduction of communications sent to the board of aldermen after the 30th of August, 1884. That evidence has already been considered. It clearly had a bearing in the way of maintaining the probability that the confederated aldermen were actuated by the motive, expectation and design mentioned by Fullgraff in his evidence as a witness. They had a tendency to sustain such evidence, and for that reason, having been brought to the attention of the board of aldermen as they were, were properly received upon the trial of the indictment. Indeed, any fact or circumstance tending to maintain the probability of the truth of Fullgraff's statement was legal evidence which the court was bound to receive, and this was of that description.

The admission of the testimony of the witness Pottle, a reading clerk of the assembly, was very strenuously objected to, and it has

been likewise resisted upon the argument of the appeals. His evidence has in part already been mentioned in considering the question whether the case should have been submitted as it was to the jury. The proposal was to prove that the defendant offered Pottle the sum of $5,000 to add the words "Broadway and Fifth avenue" to the bill, thereby permitting a horse railroad to be constructed upon such streets, when it otherwise could not be done, and that when the witness declined that proposition the defendant offered him the same amount if he would give him the original bill, which had then been passed. This offer of proof was objected to upon several distinct grounds, but the one now relied upon is that it tended to establish the commission of another crime by the defendant. And such no doubt was the effect of the evidence, for the witness stated that these two offers were made to him, the first for the alteration of the bill, the second for the bill itself, by the defendant. But while the evidence did tend to establish the commission of another crime in this manner by the defendant, it also had a tendency to establish the case charged against him by the indictment. It was in the same relation to it as was the testimony of Phelps, for it tended to show that the defendant was determined, as far as he might be able to do so, without being particular as to the means, to obtain the right to build a railroad in Broadway. That was his overpowering motive, as it had been during many preceding years of his life, and it continued to be so until this right or privilege was secured, and its existence was direct evidence sustaining the probability that he would be willing to purchase it, as it is alleged he did, before he would be defeated or frustrated in accomplishing the end he had in view. The evidence distinctly presented the motive which to a great extent had actuated him through his life, and which there was good reason for believing was never lost sight of, but continued to influence his conduct in the same manner, that it illustrated it in this instance, through the proceedings of these aldermen, by which the privilege was finally secured. And where that may be the character of the evidence objected to the courts are bound to receive it upon the trial of the alleged offender; and that in creating it he involved himself in another criminal charge is no good reason why the evidence should be excluded. That was the fault of the defendant himself; he was not called

upon under this indictment, neither in form nor effect, to answer what did transpire between himself and Pottle, as another criminal charge, but he was simply called upon by means of the evidence to avert its effect so far as it tended to illustrate or prove the motive existing in his mind. That was all the relation it had to the charge contained in the indictment, and it was all the use which was made of it upon the trial. A prominent point included in the prosecution was the motive operating upon the defendant's mind. It was charged that he was extremely desirous of obtaining this franchise. And if he was, that fact lent some countenance to the further charge that he had resorted to this illegal mode of securing it. That was a pertinent subject of inquiry, and all this evidence was appropriate to its development, aiding and assisting the jury in reaching the conclusion which they did. Upon this subject of motive or intent it has frequently been held that other transactions, tending to prove its criminal existence, may be given in evidence against the defendant, ( *Weyman* v. *People*, 4 Hun, 511; *Mayer* v. *People*, 80 N. Y. 364; and *People* v. *Shulman*, id. 373, note), where Judge EARL delivering the opinion of the court used this language: " But it is said that the transactions proved here were too remote and not sufficiently related to and connected with the principal transaction to be competent evidence. It is obviously impossible to lay down any general rule limiting the time within which such transactions must have taken place in order to render proof of them competent. It is generally said in the cases that they must have occurred about the same time as the commission of the alleged crime, but that is quite indefinite, and in some of the reported cases proof of them has been received, although they occurred months before and after the time of the crime. Each case, as to the application of this rule, must depend largely upon its own circumstances, and not unfrequently the limit of them must rest entirely in the discretion of the judge presiding at the trial." (Id., 376.) The criterion ordinarily followed is whether the defendant in the different transactions appears to have been actuated by the same motive or intent, and if he does, one may be proved to exemplify and sustain the existence of the alleged intention leading to the other. In *People* v. *O'Sullivan* (104 N. Y., 481), it was held to be competent upon an indictment

for a rape to prove a preceding assault by the defendant on the prosecutrix for the same purpose. And in *Weed* v: *People* (56 N. Y., 628), the general rule was followed, that evidence tending to prove any fact constituting an element of a crime charged in an indictment is competent, although it may tend to prove the person guilty of some other crime. This evidence had a tendency directly to sustain a distinct element in the case set forth by the indictment. And *Commonwealth* v. *Tuckerman* (10 Gray, 173, 200); *Commonwealth* v. *Jackson* (132 Mass., 16); *State* v. *Lapage* (57 N. H., 245); *Commonwealth* v. *Abbott* (130 Mass., 472), and *Commonwealth* v. *Merriam* (14 Pick., 518), support the same view. What is required, and all that is required, to entitle the court to receive and act upon it, is that it shall have a direct bearing upon the development of the case presented by the indictment. And *Shaffner* v. *Commonwealth* (72 Penn., 60) is not in conflict with, but concedes the correctness of this principle. And so does the case of *Commonwealth* v. *Bradford* (126 Mass., 42), and also the case of *Commonwealth* v. *McCarthy* (119 id., 354). It is subject, however, to the qualification that the evidence tending to establish the commission of another offense, shall be so far limited and restricted by the court as to leave the jury only at liberty to use it to discover the motive or intent actuating the accused. (*Commonwealth* v. *Shepard*, 1 Allen, 575, 581, 582; *Commonwealth* v. *Choate*, 105 Mass., 451; *Commonwealth* v. *McCarthy, supra.*) And the same qualification was attached to the rule in this State in *Mayer* v. *People* (80 N. Y., 372). And the principle permitting the admission of this character of evidence receives the additional support of *People* v. *Wood* (3 Parker, 681); *People* v. *Stout* (4 id., 71, 129), and *Pierson* v. *People* (79 N. Y., 424). And at the close of the trial the bearing, weight and effect of the evidence was carefully guarded by the court, for the jury were directed by the justice presiding at the trial only to consider it as showing the extent of the defendant's feeling, interest and desire. And the statement was then made to them that, " it is here because it was part of a conversation tending, like other evidence in the case, to show motive, interest and desire. So far as it tends to throw any dark shadow upon the character of the defendant, I desire you to eliminate it from your consideration and treat it merely as evidence tending to establish depth of interest,

motive and desire." And that was all that was required by either of these authorities, to guard the jury against any improper use being made of this testimony. It has been said, in answer to this position, that jurors hearing such testimony would be affected by it, no matter what might be said to them in the way of guarding against such a result. But while such intimations have sometimes been given concerning the trial of criminal cases, they were much better adapted to periods when intelligence and judgment were not so general as they now are. Jurors are now reading, thinking and intelligent men, having control of their inclinations and judgments. And when they are directed, under the solemnity of their oaths, to restrict a particular species of evidence, exclusively to one consideration or aspect of the case, it may not unreasonably be supposed that they will have the ability, as well as the disposition, to comply with the direction. That there has been progress made in this branch of the law, is evident from the form of the present statute, defining the competency of jurors, and allowing them to hear and determine a criminal charge, even where they have formed or expressed an opinion, provided, they can lay that opinion out of sight and receive the evidence and dispose of the case without being affected by it. The law assumes the existence of this ability to control the action of the mind, and so do the authorities to which reference has been made. The ruling has been further assailed because the offer was regarded by the defense as specious and insecure and made for the purpose of laying before the jury the fact of an attempt by the defendant to commit another offense. If that were the case within the principle sustained by *Coleman* v. *People* (55 N. Y., 81), the ruling would necessarily be an improper one. But there is no evidence in the case which would warrant the conclusion being adopted, that this proof was offered for any other purpose than that disclosed during the trial, which was to establish the fact of the defendant's inclination, interest and desire to obtain this franchise. The case of *People* v. *Gibbs* (93 N. Y., 470) has really no application to this appeal, for there the assault which was allowed to be proved, was upon a different person, and it had no relation whatever to the one for which the defendant was then upon trial. The objections are considered therefore, to have been properly overruled and the evidence

legally received, as it was limited in this manner by the charge
of the court.

Proof of the answers made by the defendant in his examination
before the senatorial committee, in the year 1886, was in like
manner objected to on the part of the defendant. The objections
were overruled and the defendant's counsel excepted to the decision,
and these answers were in part read by the counsel for the prosecu-
tion, and the residue afterwards by the counsel for the defense.
As the answers were given before the senatorial committee, they
tended to establish the fact that he had untruthfully answered
questions propounded to him, and that instead of disclosing, as it
was reasonable to assume he had the ability of doing, what had
been done with a large amount of money which had passed through
his hands during the period referred to in the indictment, he denied
having any recollection of their disposition. This evidence afforded
ground for argument that the defendant had used the money in
a manner which he was unwilling to admit; that instead of being
applied and appropriated to some lawful purpose or business, it had
been used to bring about an illegal result, and probably the one
charged to have been secured by him in the indictment. This
evidence is urged by the counsel for the defendant to have been
improperly received upon the trial, for the reason that, by section 6
of article 1 of the Constitution of the State, it has been declared that
no person shall be compelled in any criminal case to be a witness
against himself. And this provision of the Constitution having
been liberally construed in favor of the accused, has been held to
include all cases where he may be compelled to furnish or supply
evidence which might be used to his injury afterwards upon any crim-
inal trial or proceeding brought against himself. (*Boyd* v. *United
States*, 116 U. S., 616; *State* v. *Froiseth*, 16 Minn., 296; *People* v.
*Mather*, 4 Wend., 230; *People ex rel. Hackley* v. *Kelly*, 24
N. Y., 74, 82.)

The question accordingly arises whether these answers, given
before the senatorial committee, were compulsorily extorted from
the defendant. As a matter of fact they were not, for the pro-
ceedings before the committee show that these answers were all
voluntarily given by the defendant. There was no objection on
his part that he could not answer the questions without his answers

having a tendency to criminate himself, and no ruling by the committee that he must give such answers. But he was simply brought before them by their summons, and the examination proceeded without any objection whatever being made, interposing any privilege of the defendant by which he was entitled to be shielded or protected from making answers which, in any other trial or proceeding, would have a tendency to establish the existence of a criminal charge against him. It is not necessary, however, that the defendant should have invoked this protection from the committee before he made his answers, to entitle him to the exclusion of the evidence, if, in fact, he was by statute compelled to answer the questions propounded to him, for compulsion may as well be created by statutory authority requiring the witness to answer as it would be by a direct ruling on the particular occasion compelling him to answer. So that while his evidence before the committee appears to have been voluntarily given, so far as a failure to object or claim his privilege would render it voluntary, still, if he was acting under a mandate of a compulsory statute, the same principle of protection would apply as would exist if he had actually objected to answering the questions put to him; and it is on the ground of the existence of such a statutory enactment that the endeavor has been made to sustain the objection to the admissibility of the answers of the defendant given before the senatorial committee. The statute, and the only statute relied upon as compulsorily requiring the defendant to answer the questions which were then put to him, is section 79 of the Penal Code of the State, which has declared that a person offending against any provision of any foregoing sections of this Code, relating to bribery, is a competent witness against another person so offending, and may be compelled to attend and testify upon any trial, hearing, proceeding or investigation, in the same manner as any other person. But the testimony so given shall not be used in any prosecution, proceeding or investigation, civil or criminal, against the person so testifying. And a person so testifying to the giving of a bribe which has been accepted, shall not thereafter be liable to indictment, prosecution or punishment for that bribery, and may plead or prove the giving of testimony accordingly, in bar of such an indictment or prosecution.

And an effort has been made to bring the evidence given by the

defendant before the committee within this section of the Penal Code, for the reason that its members were engaged at the time in making an investigation under a resolution of the senate, which investigation was directed to the charge of the bribery of the board of aldermen in granting this concession to the Broadway Surface Railroad Company. To give this word " investigation," as it has been used in the section, point and effect in this case, reference has been made to the preceding law contained in section 8 of chapter 742, of the Laws of 1869. But that does not aid in the construction of this section as it is contained in the Penal Code, for the investigation mentioned in this preceding law was clearly expressed and differently described. It was an investigation " by any committee of the legislature or either house thereof into the conduct of any member thereof," and that is all that was provided for in this respect by section 8 of the preceding law. The investigation was there particularly limited to an inquiry into the conduct of any member of the legislature by either house, or a committee thereof, while in this section of the Penal Code it has not been so applied, and has in no manner been controlled in its signification otherwise than by the context and language of the section itself. It was evidently not intended as a continuation of the preceding law, but it was a new and distinct provision from that embodied in that law. And instead of being designed to perpetuate that legislation, it was probably intended to carry into effect article 15 of the Constitution of the State as that was adopted in 1874 and went into effect on the 1st of January, 1875. By section 2 of that article it was declared that " any person who shall offer or promise a bribe to an officer, if it shall be received, shall be deemed guilty of a felony and liable to punishment, except as herein provided. No person offering a bribe shall, upon any prosecution of the officer for receiving such bribe, be privileged from testifying in relation thereto. And he shall not be liable to civil or criminal prosecution therefor if he shall testify to the giving or offering of such bribe. Any person who shall offer or promise a bribe, if it be rejected by the officer to whom it is tendered, shall be deemed guilty of an attempt to bribe, which is hereby declared to be a felony." But the defendant is manifestly not within the language of this section of the Constitution. For while the jury were supported in the conclusion adopted by them

that he had both promised and given a bribe, he did not testify either to the giving or offering such a bribe upon his examination before the senatorial committee. And it is only when such testimony shall have been given by the witness that, under this provision of the Constitution, it has been declared that the person offering the bribe shall not be privileged from testifying in relation thereto and not be liable to civil or criminal prosecution afterwards therefor. To exonerate himself under this provision, and to be entitled to the privilege provided for in it if it applied to the case at all, the Constitution has required that he shall first testify to the giving or offering of such bribe. No such testimony was given by the defendant in his examination before the committee, and no such exoneration was, therefore, secured to him by this language. In his answers before the committee he expressly denied having either promised to give, or in fact, to have given a bribe to this or any other alderman, and for that reason his testimony did not bring him within the protection of this provision of the Constitution. The objection which has been made must, therefore, rest upon the effect to be given to section 79 of the Penal Code.

The connection in which the word investigation has been used in this section, leads directly to the conclusion that it was designed to relate exclusively to proceedings in court, or before a committing officer, for it has required the offending witness to attend and testify only "upon any trial, hearing, proceeding or investigation," and by this connection of the word subjecting it to substantially the same signification as the preceding words are entitled to receive, and they clearly include no other than such proceedings as have just been mentioned. It is simply a continuation or a repetition for more abundant caution of what has before been declared, and to include only all legal proceedings carried on in courts of justice or before judicial officers. It is a general rule of construction, applicable to statutes enacted in this manner, that the words repeated and continued, as these have been, shall be held to relate to the same subject matter or course of proceeding. (*Corning* v. *McCullough*, 1 Comst., 47, 68, 69 ; *Sands* v. *Hill*, 55 N. Y., 18, 23 ; *Gleadell* v. *Thomson*, 56 id., 194, 197 ; *McGaffin* v. *Cohoes*, 74 N. Y., 387, 389.) The subject evidently within the legislative mind was a trial, hearing, or proceeding upon a particular charge, and that was the subject which it was

intended to include in this additional word investigation, for it was not used independently to include a different or distinct class of cases or proceeding as the words were in the act of 1869, but in connection with the preceding language which it was intended to some extent to characterize and enlarge, and it may be very well so limited and full effect still be given to the preceding words " trial," " hearing," " proceeding," for it will then have ample room for all the effect to which it may be entitled, including in that manner investigations, properly so-called, before a grand jury or before committing magistrates or coroners, each of which is a legal investigation of a criminal charge, and a proceeding or hearing in the nature of a preliminary trial.  That these words were designed to be restrained in this manner is further apparent from the preceding portion of the same section, for they relate to the trial or proceeding of some other person than the witness who may have offended against the provisions of the statute; and the only obligation which has been created requiring a person offending against one or more of the preceding provisions of the Code to testify, is to testify against another person.  That is another person besides the person so offending, and it is to testify in that manner, and only in that manner, upon a charge against the other person that the offending witness may be compelled to attend and testify on any trial, hearing, proceeding or investigation, and it is only in case of giving such testimony against another person that it has been provided that the testimony so given by the witness, shall not be used in any prosecution or proceeding, civil or criminal against himself.  To derive the legislative meaning from the section, it is essential to examine and consider together all of its provisions; neither can be rejected as not entitled to consideration, and by considering the entire section together it is manifest, although perhaps somewhat obscurely expressed, that the proceeding, in which the witness is compelled to attend and testify, is to be not only a legal proceeding, but it is to be a proceeding against another person charged with having offended against one of the preceding provisions of the law, by way of a trial, hearing, proceeding or investigation of that specific charge, and no other, and no less than that; and this construction conforms to the section of the Constitution already quoted, and section 4 of the same article which have been clearly limited by their language to a legal prosecution.

Beyond these considerations is the additional circumstance that the legislature provided, by sections 68 and 69 of the same Code, for the precise cases of investigations before either house of the legislature, or any committee thereof; and having so expressly provided for that proceeding it cannot be reasonably supposed that it was intended to include it again in the provisions made by section 79; for if that had been the intention, and the word "investigation," as used in this latter section, was intended to include proceedings before the legislature, or a committee of either house, there clearly would have been no occasion whatever for the enactment of these preceding sections, and it is not to be supposed that the legislature would uselessly have included in section 79 a subject matter already fully provided for by preceding sections of the same act. The presumption, on the contrary, is that distinct and different subjects were made the objects of these different enactments; and that is precisely what has been done, for by section 68 provision has been made for summoning persons to attend before the legislature or any committee thereof. And the next section has declared that "a person who, being present before either house of the legislature, or any committee thereof authorized to summon witnesses, willfully refuses to be sworn or affirmed, or to answer any material or proper question, or to produce, upon reasonable notice, any material and proper books, papers or documents in his possession or under his control, is guilty of a misdemeanor." This section fully includes the investigation made before this senatorial committee. It was not an investigation or proceeding against any person, but its object was to discover facts and obtain information which might lead to legislative action. So far it was within the province of the legislature, but to have extended it to a proceeding against the defendant himself on a criminal charge, or against another person, was beyond its authority as that has been defined in *People ex rel. McDonald* v. *Keeler* (99 N. Y., 463). That case has also determined that on such an investigation before a legislative committee the person examined as a witness is not entitled to counsel, as he manifestly would be if it was a legal proceeding or investigation against himself, for by section 6 of article 1 of the Constitution a person proceeded against on a criminal accusation is entitled to be allowed counsel to appear and defend for him; and this

provision, although in its language applicable only to a trial, has been liberally enlarged by construction so far as to include proceedings before a court-martial (*People ex rel. Garling v. Van Allen*, 55 N. Y., 31), and may, in the same spirit, be properly extended to all proceedings where a criminal charge against a person as an accused individual may be made and heard. The fact, therefore, that counsel is not entitled to appear on behalf of any witness, in investigations of this description, supports the construction already mentioned that it was intended to confine the provisions of section 79 to proceedings against a distinct person and not to legislative investigations, which are not proceedings of that description. Section 69, applying to and including these investigations, although enacted in broad language, has not required a person appearing before a legislative committee to answer questions criminating himself, or having a tendency to produce that effect, or exempted him from the use of his answers against him in any future criminal proceeding. It has directed, in general terms, it is true, that the witness who shall refuse to answer any material or proper question shall be guilty of a misdemeanor. But a refusal to answer a question which may elicit evidence tending to establish a criminal charge against the witness for which he has been provided with no protection by this section is not a refusal to answer any material or proper question within the meaning of this provision. For the section has not undertaken to deprive the witness of his privilege or to exonerate him from the consequences of its loss, by declaring that the evidence given by him shall not afterwards be used against him. Such a provision in the law is necessary for the protection of the witness before he can be obliged under it to answer any question which may have the effect of subjecting him to a criminal charge. Without it the constitutional provision applies in its full force in favor of the witness, declaring that he shall not be compelled to be a witness against himself. And to oblige him to testify when his testimony may have a tendency to criminate himself, it is therefore requisite that the law imposing the obligation shall at the same time provide that his evidence shall not be used afterwards against him. (*People ex rel Hackley* v. *Kelly*, 24 N. Y., 74, 83.) This section contains no such provision, and it accordingly is not to be construed as requiring the witness to be compulsorily deprived of his privilege

by giving answers tending to his own crimination. He is to answer every material and proper question which, under the Constitution, includes only such questions as have no tendency afterwards to criminate him, or subject him to any criminal legal proceeding. The section is to be construed with reference to the fact that the Constitution deprives it of any greater effect. This subject was considered very much at large in *Emery's Case* (107 Mass , 172). He was a witness brought before a legislative committee for examination under a somewhat similar statute. He declined to answer for the reason that his answers might have a tendency to subject him to a criminal proceeding, and he was committed for a contempt in not answering the questions. After his commitment he was brought before the court upon a writ of *habeas corpus*, and it was held by the court that he was entitled to his discharge, for the reason that the law could not oblige him to answer such questions in view of the constitutional provision of the State, without at the same time specially providing for his protection in such a manner that his answers should not afterwards be used against him. That case is direct and apt in its application to the construction and effect of this section of the Code, and requires it to be so construed as to subject the authority of the legislature, as well as its committees, over witnesses brought before them to the existence and continuation of the witnesses' privilege to decline to answer any question having a tendency to criminate himself.

That it should be so construed appears to follow from other and more general statutory provisions uniformly so understood. By subdivision 6 of section 143 of the Penal Code, it has been declared in the same unqualified manner that a person shall be guilty of a misdemeanor who contumaciously and unlawfully refuses to be sworn as a witness, or after being sworn to answer any legal and proper interrogatory. The same provision was contained in 2 Revised Statutes [2d. ed.], (207 § 10, sub. 5), making it as the present Code, as well as the Code. of Criminal Procedure have, a contempt to refuse to answer any legal or proper. interrogatory. (Code of Crim. Pro., §§ 635, 619.) These provisions, as well as that contained in section 69 of the Code, by their general language, ostensibly include every material or pertinent question that may be propounded to the witness. But they never have

been construed to have that effect. The construction placed upon them, on the contrary, has been that while the language has been employed in this general manner, the witness is not deprived of his privilege by it, or compelled to answer, but may insist upon that privilege as a protection against answering any question which he deems to be criminatory in its effects. And if, after availing himself of this privilege, he is then compulsorily required to answer by any tribunal or committee before which he has been sworn, that compulsion will entitle him to the protection of the Constitution and prevent his testimony from being used afterwards against him. These laws have always been so administered and carried into effect; and for that reason, as they do not compel the answers where the witness may appear, and, without invoking the protection of his privilege, voluntarily gives his evidence, that evidence may be afterwards read against him, although it may have a tendency to subject him to a criminal charge.

The rule upon this subject was stated in the leading opinion of the court in *Hendrickson* v. *People* (10 N. Y., 13), and its correctness was also agreed to in the opinion of GARDNER, Ch. J. It was there held as the law that " it is now regarded as a well settled rule, and recognized in the elementary books, that where a witness answers questions upon examination on a trial tending to criminate himself and to which he might have demurred, his answers may be used for all purposes. (2 Stark Ev., 50; Roscoe Cr. Ev., 45.) Such answers are deemed voluntary, because the witness may refuse to answer any question tending to criminate him. (1 Greenl. Ev., § 225.) If, however, he should be compelled to answer after claiming his privilege, his answer will be deemed compulsory and cannot be given in evidence against him." (Id., 27.) This states the law of the case applicable to this appeal. The witness was not obliged by any statututory provision to make or give the answers which he did before the committee; and not being so obliged, if it was his purpose to protect himself against the use of such answers afterwards in a criminal proceeding which might be instituted against himself, it was necessary that he should claim and insist upon his privilege, protecting himself against the obligation to answer if such answers would criminate him. He did not do so, but voluntarily answered the questions propounded to him by the committee;

and having given those answers voluntarily and without any compulsion of law, or of the committee, they were admissible in evidence upon his present trial under these general rules of law, and particularly under their enunciation and explanation contained in the case just referred to, where it is also added (id., 29) that, "independent of any supposed authority, I do not see how, upon principle, the evidence of a witness not in custody and not charged with a crime, taken either on a coroner's inquest or before a committing magistrate, or grand jury, could be rejected. It ought not to be excluded on the ground that it was taken on oath. That reason would exclude also the statements of witnesses on the trials of issues. The evidence is certainly none the less reliable because taken under the solemnity of an oath. No injustice is done to the witness, for he is not bound to criminate himself, nor to answer in regard to any circumstance tending to do so. * * * Nor can the exclusion of the evidence depend on the question whether there was any suspicion of the guilt of the witness lurking in the heart of any person at the time the testimony was taken. That would be the most dangerous of all tests, as well because of the readiness with which proof of such suspicion might be procured as of the impossibility of refuting it. Besides the witness might have no knowledge of the existence of any suspicion, so that his mind could not be affected or his testimony influenced by it. It is only when he is charged with crime and examined on such charge that there is good reason for treating him as a party to the proceeding. The common law has been as tender of the rights of witnesses as of parties. It is the policy of the common law never to compel a person to criminate himself. That policy secures as well to a witness as to a party the privilege of declining to answer. The former is supposed to know his rights; the latter is to be specially instructed in regard to them by the presiding magistrate. But if either fail to avail himself of the privilege, his answer is deemed voluntary and may be used as evidence." (Id., 29, 30.) And the fact that the witness may be present under the direction of a subpœna or summons will not change the application of this rule (*People* v. *McGloin,* 91 N. Y., 241); where the substance of the authorities was held to be "that all confessions material to the issue voluntarily made by a party, whether oral or written, and however authenticated,

were admissible as evidence against him on a trial for a criminal offense." And that "it was no objection to the admissibility of such confessions that they had been taken under oath from a person attending before a coroner in obedience to a subpœna, upon an inquiry conducted pursuant to law into the causes of a homicide." (Id., 247.) And this was again declared to be the law in *People* v. *Mondon* (103 N. Y., 211). The substance and effect of the authorities, therefore, is that where the witness is not in custody on a charge or suspicion of his guilt, and is neither compelled by any statutory provision nor by the ruling of the tribunal before which his testimony may be taken to answer criminating questions, but he voluntarily proceeds, without objection or claim of his privilege, to make a statement detrimental to or inculpatory of himself, that statement may be used as evidence against him in a subsequent prosecution for the offense it may tend to establish. This rule seems to be general and well supported by the authorities, and it is directly applicable to the disposition of this point, inasmuch as there was no statutory or other compulsion exercised over the defendant at the time when he gave his evidence before the senatorial committee. But the statements were made by him after securing the aid, advice and assistance of counsel, one of whom at least was permitted to be present during his examination. This construction of the law has been resisted as harsh and hazardous to the witness, who may be unable to understand it in that manner. But it is not considered to be so, for if such inability be conceded his full protection is secured by his privilege not to answer, and insisting on the observance of that privilege in all doubtful cases. The objection now under consideration consequently cannot be sustained, but was correctly overruled by the judge presiding at the trial.

The possession by Aldermen Farley and Miller of large bills after the consent had been given by the common council and by Maloney also of two gold certificates, one for a thousand and the other for five thousand dollars was not improperly allowed as proof on the trial. It at least tended to establish the probable identity of the money in the hands of these different aldermen and the large bills that were obtained upon the sale of the $500,000 in bonds; and as the evidence tended to establish the fact that there was concert of action between these different persons and the persons making sale

of the bonds and disposing of the money for distribution, it was within the established rule of law permitting the facts to be laid before the jury as having probable connection with the charge contained in the indictment.

The law as to cases of this description where there is probable confederacy of action between different individuals in the commission of a crime, some performing one act, others another, to carry into effect what may appear to be concerted action resulting in the crime, is that what each person in the promotion of the common enterprise may say or do, is admissible against the others. They are circumstances tending to establish the commission of the offense alleged in the indictment, and they are so considered and mentioned in a standard work upon the administration of the criminal law. (Whar. Am. Crim. Law [4th ed.], §§ 2351, 2355.) There is ordinarily no other mode in which the commission of the crime of bribery can be established as a matter of fact. Very large liberty is justly allowed in making the proof by means of circumstances having either a direct or even a remote bearing upon the probability of the truth of the charge. And whether it be alleged in the form of a conspiracy between the persons charged, or a mere confederation or concert of action is not important. The test is whether the parties charged were probably co-operating together to bring about a particular criminal result. And when that probability has been reasonably well established evidence may be received of their individual acts and statements contributing to that end. And it has been so considered in *Kelley* v. *People* (55 N. Y., 565); *Place* v. *Minster*, 65 id., 89); *State* v. *Winner* (17 Kan., 298). And the cases referred to by the counsel for the people of *Cox* v. *State* (8 Tex. App., 302); *Avery* v. *State* (10 id., 210), and *Heard* v. *State* (9 id., 1), support the same general principle of law. All these acts tended to shed light on the conduct of these parties, and they were connected with the charge in the case by the evidence of Fullgraff and that of the individuals who purchased the bonds and paid for them in large bills of the description mentioned in this evidence.

A further objection was taken to what took place between Miller and De Lacy, when the latter handed the former $5,000, in bills of this general description. When the bills were handed to Miller he was told by De Lacy that "there is something to buy election

tickets with." And according to the evidence of Fullgraff, one of the objects for which $5,000 were to be first paid over was to defray the expenses of members of the board of aldermen who should be candidates for re-election in the fall of 1884. Miller was asked whether he understood at the time that the payment was on account of the Broadway Surface Railroad Company, and replied that he had no understanding of that kind. He was then asked what his understanding was, which was objected to by the counsel for the defendant, but the court allowed the answer to be received and they excepted. The witness, however, stated that there was no particular understanding; that there was nothing said about it, which of course rendered this ruling of the court entirely harmless. The inquiry was then made of Miller as to what he thought the money was given to him for. The court permitted that to be answered, and the witness not answering this inquiry as it was put replied that he supposed it was for the Broadway road, "although there was no contract entered into either by him or myself." Strictly speaking this ruling was erroneous and an answer to the question should not have been permitted to be given, for what the witness thought in no way rose to the dignity of evidence, as it is defined and received in courts of justice. But while it was erroneous to permit the question to be answered, the answer that was obtained was not responsive to it, and in no manner could have prejudiced the defendant, for a mere supposition of this description would never be accepted or acted upon by the jury as proof indicating the existence of a fact. And the subsequent examination of the witness also laid before them all the facts relating to the payment and receipt of this sum of money, for Miller stated, without objection, that he, on the second day afterwards, met De Lacy on Broadway, and requested him to call at the store of the witness. The next day De Lacy went there and the witness stated to him: "DeLacy, here, I have received this money from you," and I says "I am going to give it to you back." He says "what is that for?" I says "I don't want it." Says I, "I never would agree to vote for that railroad or any other railroad." And says I, "This money I will give you back, and I gave it back to him." This interview, as well as what had previously taken place between the witness and De Lacy, sufficiently explained the transaction, so that there could be no mistake and no misapprehension on the part of

the jury. They saw precisely from it what had been said and done. And certainly the jury could not, after that, if they would otherwise have been disposed to do so, have given any effect whatever to the mere expression of the supposition of the witness. In the case of a long and intricate trial, as this was, it may not be unexpected that slight and formal errors will intervene. And if the judgment should be reversed because of the correctness of mere technical objections of this character the administration of the criminal law in cases of this description must necessarily fail. To prevent that has been one of the objects of the present codification of the law relating to criminal proceedings. And to secure that end it has been declared by section 542 of the Code of Criminal Procedure, that, "after hearing the appeal, the court must give judgment without regard to technical errors, or defects, or to exceptions which do not affect the substantial rights of the parties." This was an exception, even if the answer was within it, of that description. And as mere supposition of the witness in no respect tended to prove any fact to the prejudice of the defendant; for that reason under this authority it is required to be disregarded.

In the course of the trial the prosecution were allowed to prove that Maloney, Keenan, De Lacy, Dempsey and Sayles were in Canada. The defense excepted to the ruling allowing this proof, but it was given under the announcement of the district attorney that the object was no more than to show their absence from the State, and his consequent inability to produce them as witnesses upon the trial. The object of this proof, which was given as it was proposed, was to avoid any anticipated or expected argument on the part of the defense that the prosecution should produce and swear these persons as witnesses who would be able to give positive evidence of the facts if a crime had been committed, instead of relying upon the circumstances which the testimony in the case tended to prove. It was not given to establish the fact of flight on the part of either of these persons, and the case, therefore, is not within *People* v. *Stanley* (47 Cal., 113), but it was solely and only to prove their absence beyond the jurisdiction of the court, and that proof was received by the court, and properly so, too (*Pease* v. *Smith*, 61 N. Y., 477); and beyond this is the further fact, to which weight and effect should here be given, that the defendant's counsel previously proved, by

the cross-examination of Fullgraff, that De Lacy, one of these persons, was in Canada, and having in this manner opened the door to such proof, could not very well prevent the district attorney from following it up by additional evidence on the same subject, and including these four other persons. (*People* v. *Buddensieck*, 4 N. Y. Crim. Rep., 230 ; S. C., 103 N. Y., 487, 496.) No good reason appears in favor of sustaining the objections taken to evidence as to the state of the books of the Broadway and Seventh Avenue Railroad Company, or as to the reports which were made by its treasurer. The object of the proof was, in part, to establish the probability that the purpose mentioned in the resolution for issuing the $500,000 in bonds, was fictitious and designed to conceal the real object and motive which the managing directors of the company had in view ; for that purpose it was legitimate proof to show that their proceeds and the distribution of such proceeds were not accounted for in the books of the company. The defendant was one of the directors of that company, having something certainly to do with the management and direction of its affairs, and the absence of a truthful statement of the sale of the bonds and the use and disposition of the money was a circumstance which it was proper should be introduced in the case by way of evidence, supporting the theory of the prosecution. This business was carried on in his interest by his associates, and if it had been the design to raise the money and use it for the purposes mentioned in the resolution, it is fair to presume, as a matter of fact, that some evidence of that design would have been found upon the books or in the reports of the company. No intelligible account was given of any disposition of this money in either of these documents. The witness, by whom the entries were proved, did apply to the officers for information as to what he should debit in the books on account of the disposition of the five hundred thousand dollars in bonds, without obtaining any such information. There was, however, placed upon the books a statement of expenditures, amounting to the sum of $500,000 after the completion of these transactions. This proof was objected to on the part of the defendant, but it appeared that the material or larger part of the entries was made upon vouchers authenticated by the defendant himself, and the account was allowed to be read only after proof was given of the inability

to find and produce the original vouchers upon the trial. A large amount of the charge on the books consisted of horses, which the evidence of Newell stated were obtained under the instruction of Mr. Foshay, the president of that company; and evidence was given tending to establish the fact that the price of these horses was greatly overcharged, and that the account itself was probably a fictitious attempt to explain the disposition of the $500,000 in the early part of the year 1885, after the transactions referred to in the indictment were substantially consumated and completed. In the same general line was the testimony which related to the transactions with the banks, for they tended to explain the dealings between these different individuals, not only connected with this statement of the account, but with the disposition of a part of the proceeds of the issue of the $1,500,000, in bonds, by the Broadway Surface Railroad Company, and connecting them with it as a part of the general transactions involved in the examinations made at the trial. They were, perhaps, not very important evidence in any respect, but it was sufficient to justify the court in receiving it that it had a tendency to explain some of the obscurities otherwise pretented by the case, and the same thing was true as to the loans made by Kerr to Sharp in 1884, and adjusted and paid in June 1885. These, together with the other circumstances likewise made the subject of objection, were part of the minutiæ of the case which the court could not well have excluded, although they might prove of little service in its solution and disposition.

No possible injury was occasioned to the defendant by allowing the mayor to state in his testimony the considerations influencing him in writing his veto message, for it clearly appeared from that document and those accompanying it which were sent in to the board of aldermen. What he said was entirely harmless upon this subject, and he gave no other point or influence to the documents themselves than was entirely apparent from their face. It has already been held that the court was right in receiving them as part of the proof bearing upon and indicating the probable motives of the members of the board of aldermen, who, after they were received still voted for the granting of this franchise to the defendant's company.

These latter objections have neither of them been argued with

any degree of earnestness, but have been suggested by way of memoranda in the points upon which errors are affirmed to have intervened in the progress and disposition of the trial. They have been examined the same as though they were more fully pressed upon the attention of the court, but their examination fails to sustain either position, and for that reason neither of these exceptions is found to be of any substantial benefit or advantage to the defendant.

The other objections arise upon exceptions taken to the charge of the judge presiding at the trial. It is not requisite that they should be examined fully in detail as they have been noted upon the brief, for the reason that the charge is not liable to the objections contained in the notation, and as to some of them the points have already been considered and disposed of adversely to the defendant. The more prominent exceptions, and those deserving some consideration, relate to particular suggestions or remarks made in the submission of the case to the jury. Exception was taken to the reference made by the judge to the acts of agents participating in carrying forward a criminal intent, if that should be found to be maintained by the evidence. It has been urged that there was no evidence of any agency, but what the court evidently intended by this reference was the acts of the parties who might be found to have concurred in planning and completing the commission of the offense. The agents so referred to were no others than the principals in the transaction, either of whom would be, strictly speaking, in what he did to further the general design, the agent of the others, and for such conduct on the part of either, the defendant, if these persons were acting in concert with him, would be legally, as well as criminally, responsible. (Penal Code, § 29.) Exception was also taken to the division of the charge into two parts, but that was formally done to bring the leading attributes of the accusation, as they were required to be proved, before the minds of the jurors. There was no error in what was said upon this subject, and not the least ground for supposing that the jury could have misunderstood the case in any of its aspects by this suggestion. A further exception was taken to what was said to the jury concerning the record of Fullgraff, as bearing upon the probability of the truth of his testimony. That, according to the

explanation which was given, included his acts and votes as a member of the board of aldermen from the time when the unlawful confederation was entered into until it was finally completed, and it was so explained by the court. This record of this series of acts was admissible and justly to be considered by the jury as tending to indicate that Fullgraff and the others acting with him, in conceding this franchise by their votes, were actuated by a corrupt agreement and understanding made upon the expectation that they were to be paid for it, as he states they were, by persons acting in the interest and for the Broadway Surface Railroad Company. The L_j dy injunction was not referred to as a corroborating circumstance in the case, but as one included in its history, explanatory, to some extent, of and affecting the conduct of the aldermen whose influence was favorable to sustaining the application of the company. Indeed, there seems to be no substantial point presented by either of the exceptions to the charge of the court from which the defendant can derive any practical advantage. The case was very clearly submitted to the jury, and although general remarks were made in the course of the charge that were simply suggestive from the evidence, the jurors were finally confined in their action to the disposition of the case upon the testimony. They were required to exclude all other considerations than the evidence from their minds, and to dispose of it under their obligations to the people and the defendant, and after these instructions had been given to them there was left no reason for supposing that their minds could possibly be diverted from that duty, or the proper disposition of the case, by the general remarks otherwise made in the course of the charge. Many requests were made for instructions to the jury, which were acceded to by the court, again guarding the defendant fully from the possibility of any misuse of testimony being made to his prejudice, which the jury were not at liberty to consider on the question of guilt. In this view the court was requested to charge again that the attempt to bribe Pottle, in the year 1883, if they believed his evidence, was not to be considered by them in any aspect of the case, and the court responded it is only to be considered as tending to show the defendant's interest in the Broadway enterprise and motive; it is not to prejudice the defendant as tending to show an independent crime. And upon the effect of the evidence of the

witness Fullgraff it was in like manner added that it was not safe for the jury to convict the defendant upon his testimony unless he was fully corroborated, and that the jury in their discretion might entirely reject his evidence. In all these respects great care was taken to protect the defendant from an unjustifiable result in the consideration and disposition of the case. All that he could ask was conceded to him. No statement was finally left to go to the jury which could improperly prejudice him, and no legal ground has been found upon which either of the exceptions generally referred to in the argument of the defendant's counsel can be maintained.

The court was asked upon the argument to set aside the verdict of the jury, because of the general observations made to them concerning the character and enormity and the disastrous effects of the crime of bribery mentioned in the course of the charge. This argument was further impressed upon the consideration of the court by the fact that eleven of the twelve jurors who sat in the case had formed an opinion as to the guilt or innocence of the defendant. But, for the reasons already advanced, this verdict should not be set aside, for the jury were not left at liberty to dispose of the case upon any influence which might be produced in their minds by the circumstances alluded to, but they were confined to the evidence itself and the convictions which such evidence should impress upon their minds. The jurors cannot, because of their opinions, be regarded as liable to have been improperly influenced by such observations, for they all testified, certainly with apparent candor, that they were still able to try the case and dispose of it without being influenced by these opinions. In this respect the case was not exceptional, and it is to be presumed that the verdict which the jury rendered had no other basis or foundation, in whole or in part, than the legal evidence in the case, which they were left at liberty only to consider.

An appeal was taken from an order denying a motion to quash the indictment, but it was held by three members of the court, in which decision the presiding justice did not participate, that this appeal had not been authorized, and that the order then made, which preceded the trial of the indictment, being no part of the judgment-roll, as that has been provided for by section 485 of

the Code of Criminal Procedure by an amendment taking effect on the 1st of June, 1887, was not before the court for its consideration. The appeal which the Code has provided for is to be from the judgment, including any actual decision of the court in an intermediate order or proceeding forming a part of the judgment. This order being no part of the judgment, as that is now provided for, was not considered to be before the court in the form in which the appeal was presented. (*Com.* v. *Eastman*, 1 Cush., 189.) But at the same time the entire subject-matter of the case has been considered on the appeal from the judgment, the order denying a new trial and denying the motion in arrest of judgment.

As the case appears no sufficient reason has been found for interfering with the result attained by the judgment. The charge, while among the gravest which can be made and most difficult to establish, was proved in such a manner as to render the subject of the defendant's guilt within the province and decision of the jury. Their conclusion was adverse to his innocence; and as no legal errors intervened to his prejudice during the progress of the trial the case, as it is presented, is one for the affirmance of the conviction and the orders included in the appeal, and which, by the practice, are regularly before the court.

As the evidence has been given, with all its great details, it leaves the conviction upon the mind, after a full examination of it, that it was not only sufficient, but that the jury were right in drawing and acting upon the conclusion which they did from it.

Both the judgment and the intermediate orders included in the appeal should, therefore, be affirmed.

VAN BRUNT, P. J.:

In concurring in the able and exhaustive opinion of Mr. Justice DANIELS it may not be amiss to add a few suggestions in reference to some of the points which were called to the attention of the court upon the argument of these appeals.

It was claimed by the defendant that he had not been afforded the fair and impartial jury which was guaranteed him by the laws. An examination of the record shows, however, that this point is by no means well founded. The defendant had no right to claim that any particular juror should be impanneled in the jury which was to

try him for this offense. All that he was entitled to was that the jury impanneled, and each and every one of them should be fair and impartial.

Upon an examination of the record presented upon these appeals, it will appear that to nine of the jurors no challenge was interposed, or if such challenge had been interposed, it was withdrawn ; that, as to two of the jurors, although the appellants challenge was overruled, no exception was taken to such ruling; and that as to one juror only was an exception taken to the overruling of the challenge. Upon reading the examination of this juror it will be seen that he was entirely competent, and that the decision of the court in overruling the challenge was not erroneous.

It is also to be observed that at the time of the impanneling of this juror, and at the time of the swearing in of the jury the appellant had, through the courtesy of the district attorney, a peremptory challenge which he never availed himself of. It is apparent, therefore, that in the opinion of the defendant's counsel this juror was one who was entirely competent to sit upon the trial of the issues raised by the indictment and plea. This being the state of the record no just complaint can be urged in respect to the fairness and impartiality of the jury.

The record contains many exceptions to the admission of evidence as to the doings and sayings of many of the persons concerned in the transactions testified to upon this trial, which rulings were claimed to be justified upon the ground that if the jury found a conspiracy between these parties to bring about a given result by unlawful means, the evidence of the doings and sayings of each one of the conspirators was competent against each and all of them.

It was contended upon the part of the defendant that as he had not been charged in the indictment with a conspiracy but with a felony, that he was being tried for a misdemeanor and convicted of a felony. It will be seen that this objection has no weight because the defendant was not being tried for a conspiracy. He was being tried for the felony charged in the indictment. And if another or different expression had been used to characterize the combination, confederation or association of these individuals for the purpose of effecting the unlawful object, the case would have been relieved

entirely of this criticism, and thus such criticism is seen to be nothing but a matter of form.

If the evidence showed a combination, confederation or association of these various parties to effect by unlawful means the object after which they were seeking, this fact rendered the evidence of the doings and sayings of each in the effectuating of that object, competent against every one of them. It is a familiar rule of law that where two or more parties associate themselves together for a given object, the doings and sayings of each in the pursuit of that object, are competent evidence against all ; and that is the simple rule which was applied in admitting the evidence, in the case at bar, of the doings and sayings of these various parties who were charged with having entered into the combination to procure, by unlawful means, the assent of the board of aldermen to the building of the Broadway Surface Railroad. Confederations of this kind rarely can be proved by direct evidence, but it is necessary to introduce circumstantial evidence from which their existence may be inferred. The books are full of cases in which, from the subsequent action of parties, juries have been allowed to infer the existence of previous agreements or contracts between them.

In the opinion of Mr. Justice Daniels it is demonstrated, as had already been decided by this court in the case of the *People* v. *O'Neill*, that the jury had a right to believe, from the testimony of Fullgraff, that there had been an agreement to bribe certain members of the board of aldermen in the interests of the Broadway Surface Railroad Company. It is claimed that the evidence of Fullgraff shows that the combination or confederation of the alderman was for the purpose of extortion, and that, therefore, the force charged in the indictment could not have been used against them by the defendant and his associates. The evidence of Fullgraff shows undoubtedly that the aldermen entering into the combination were anxious for a due consideration, to be ravished of their official virtue, and that no force beyond a money consideration was necessary to accomplish that object. But the offer of the money which was made to the board was a violent assault upon the virtue of those officials which they were not prepared to withstand, and the evidence of which furnished the proof of the force charged in the indictment. There is no evidence that the offer to vote for the Broadway Surface

Road for a consideration, came from the combining aldermen; but the proof showed that the offer was made to them, and accepted by them.

The testimony of Fullgraff and the corroborating circumstances furnished by the evidence having established, to the satisfaction of the jury, the agreement to bribe and the partial payment of the same, in looking for the individual or individuals who made the offer, the attention is necessarily directed to those who were most deeply interested in the enterprise in reference to which the felonious agreement was made.

Upon an examination of the record it will be seen that the persons most deeply interested in the success of the Broadway Surface Road were the defendant and the Broadway and Seventh Avenue Railroad Company. It appears that the executive officers of that company feared a rival upon Broadway, and that the defendant evidently expected to realize large sums out of the success of the undertaking. The Broadway and Seventh Avenue Company not only would preserve its existing lines from a dangerous rival, but it would appear that they actually realized from the enterprise additional gains, as upon the completion of the work the defendant transferred to the president of such railroad, in trust for the company, almost all the stock of the Broadway Surface Railroad Company. The defendant also secured large sums out of the undertaking, because it appears that he received all the bonds issued by the Broadway Surface Railroad Company, amounting to two and a half millions, and no expenditure appears which exceeds much more than a million of dollars.

Having our attention, therefore, necessarily directed to those most largely interested as being the probable guilty parties in this arrangement, the evidence adduced tends strongly to confirm the suspicions thus aroused.

The defendant was a director, Mr. Foshay the president, and Mr. Kerr the treasurer of the Broadway and Seventh Avenue Railroad Company, and such president and treasurer seem to have been the executive officers of the company and to have attended almost exclusively to the management of its affairs.

Immediately after the passage of the railroad act of 1884, we find the defendant, Mr. Foshay and Mr. Kerr engaged in the organ-

ization of the Broadway Surface Railroad Company, of which company four of the directors of the Broadway and Seventh Avenue Company were incorporators, and of which company the directors were the friends, relations, attorneys and counsel of the defendant and the Broadway and Seventh Avenue Company, none of whom (except, perhaps, Mr. Richmond) appear to have made any payment upon the stock subscribed for by them.

Traffic arrangements were at once entered into between these companies, although it was apparent that a long period of time must elapse before the right to build the Broadway surface road could possibly be secured. Early in June, 1884, the Broadway Surface Railroad Company authorized the issue of $1,500,000 of bonds, secured by a first mortgage, to be used and applied in furtherance of the construction and completion of its road. In this month the proposition to pay to certain members of the board of aldermen the sum of $500,000 for the purpose of securing their assent to a resolution authorizing the construction of this road, seems to have been made and accepted, and the petition of the Broadway Surface Railroad Company for the consent of the board of aldermen formally presented for their action. In July, the board of directors of the Broadway and Seventh Avenue Company, after reciting that for the purpose of carrying into effect the traffic agreement with the Broadway Surface Company, it would be necessary to purchase lands, enlarge the depot and extend the facilities of the Broadway and Seventh Avenue Company, authorized the issuing of $500,000 of bonds, to be secured by a mortgage' upon the real estate and franchises of the company, and further authorized the president, for the purpose of carrying into effect such contract, to negotiate 150 bonds of a previous issue, then in the treasury of the company. These bonds were printed as rapidly as it was possible to be done, extraordinary expedition being urged upon the engraver, and they were furnished by him in seven days after the passage of the resolution. Messrs. Foshay and Kerr immediately set about their negotiation, desiring that they should be sold at once in order that they might realize the proceeds. The broker to whom the negotiation was confided, told them that if he had a little time he would undoubtedly be able to sell these bonds at par; but their impatience was so great that the securities were

sold at a discount of about fifteen per cent, although the stock of the company was selling in the market at 160, and although there was no pressing need for any money to be used in the manner contemplated in the resolution authorizing the issuance of these bonds, as appears from the fact that no money was actually used for any of those purposes until a year afterwards, and then all of the money so used was derived from other sources. When the purchasers of the bonds came to pay for the same, the extraordinary requirement was made that they should be paid for in large bills, or if checks were received they were immediately turned into bills of a similar denomination and not deposited. In this way, on the fourth of August, all the bonds had been disposed of and $500,000 in bills realized upon the sale of securities, amounting at par to $575,000. No entries of this cash on hand were ever made in the books of the Broadway and Seventh Avenue Company as such, nor was any part of the same ever deposited in any bank account, and no portion thereof was ever applied to the purchase of lands, enlarging the depot or extending the facilities of the company, and from that time no trace of that money has ever been found, except the fragments which may have been seen in the hands of some of the combining aldermen at a later period. During all this time the defendant and Messrs. Kerr and Foshay and others were having almost daily interviews at the offices of their counsel and the Broadway Surface Railroad Company. On the fifth of August there was a meeting of the railroad committee of the board of aldermen to consider the question of granting the petition of the Broadway Surface Company, which had been referred to them. While the committee was in session, the counsel of the company drew the report to be signed by the committee and the resolution. This, when engrossed, the defendant sent to Mr. Richmond, with a request to hand the same to Maloney, who appears to have been the channel through which the defendant and his associates made their communications to the combining aldermen, to be presented to the board. This report and resolution were adopted by the committee, and at a meeting of the board, held on the sixth of August, the resolution was passed. Prior to this time, at a meeting of the board of directors of the Broadway Surface Company, the proposition was received from the defendant to construct and

equip the road of this company, and pay all legal expenses incurred, and to be thereafter incurred, in consideration of all the bonds and all the stock of the company, except that subscribed for by the directors, which proposition was accepted and a contract entered into between the parties. On the eighteenth of August the resolution of the board of aldermen giving its consent to the construction of the road was vetoed by the mayor. On the evening of this day, according to the testimony of Mr. Powell, he met the defendant at the Fifth Avenue Hotel, and in response to an inquiry as to what he was going to do the defendant told him that he had the board of aldermen fixed, or words to that effect. It is true that upon previous examinations Mr. Powell made use of different expressions, but the purport of the whole of his testimony has always been that the defendant told him that it had been arranged to pass the resolution over the veto of the mayor. Before the time arrived at which the aldermen could act upon this veto an injunction against the board of aldermen was procured. The counsel for the Broadway Surface Railroad Company intervened actively in the settlement of this litigation, and succeeded in procuring a consent for discontinuance on the twenty-ninth of August, upon which an order was duly entered. A meeting was called for the next morning at the unusual hour of nine o'clock. Mr. Maloney was engaged in procuring the signatures to the call of the meeting, and the defendant personally requested the attendance of at least one of the aldermen. At the meeting of the thirtieth of August the resolution was passed over the mayor's veto. It having been ascertained that this meeting was irregular, on the sixth of October a second petition was presented, and on the third of November a second resolution was passed, on the twenty-fourth again vetoed, and on the fifth of December again passed over the veto. Shortly after this final action the evidence shows that several members of the board of aldermen, together with Mr. Maloney, were found to be in possession of bills of precisely the same denomination as those which had been procured upon the sale of the Broadway and Seventh Avenue Company's bonds.

In June, 1885, the right to construct the road having been fully acquired the road was built. About the same time the Broadway Surface Railroad Company authorized the issuance of $1,000,000 of

bonds, in addition to those already issued, to be secured by a second mortgage on the property of the company; $450,000 to be applied to the purchase of the stage lines, with their stages, horses, harness, etc., and the balance of the bonds, $550,000, to be used and applied in furtherance of the construction, completion, finishing equipment and operation of the road. At a subsequent meeting of the board of directors these bonds, together with the first mortgage bonds and stock mentioned in the contract with the defendant, were directed to be delivered to him, he to complete in his own name the purchase of the said stage lines.

In this month an attempt was made to account on the books of the Broadway and Seventh Avenue Company for the $500,000 raised upon the sale of their bonds. For this purpose vouchers were handed by Mr. Foshay to the bookkeeper to make the entries, two of which were signed by the defendant, amounting to 302,633.32 — $230,000 of which being apparently for money paid to the defendant for horses, harness and other equipments, $7,633.32 for the construction of additional sidings, etc., and $75,000 for seventy-five cars to be delivered. The sum of $148,866.68 was also charged as having been paid for legal expenses, and $2,500 for the services of a civil engineer. By his contract with the Broadway Surface Company the defendant was to pay these legal expenses out of the proceeds of the bonds of that company, and there was no legal obligation upon the Broadway and Seventh Avenue Company to pay any part of such expenses, and in fact they were not so paid, the proof showing that they were paid by the defendant. The proof also shows that the item of $230,000 for horses, harness, etc., was fictitious; that no harness was ever purchased by or delivered to the Broadway and Seventh Avenue Railroad Company, and that but 600 horses were delivered to that company by the defendant, the outside value of which was $125 apiece, making altogether $75,000. In this way the sum of $453,000 was attempted to be accounted for, and the balance was furnished by a transfer by Mr. Kerr of $47,000 from his own private bank account to the coupon bank account of the Broadway and Seventh Avenue Company. It will thus be seen that the defendant and Mr. Kerr acknowledged the receipt of the whole $500,000, the proceeds of the bonds sold by the Broadway and Seventh Avenue

Railroad Company, which amount has entirely disappeared, as the amounts mentioned in the vouchers above mentioned, which were paid by the defendant in money, were paid by money realized on checks drawn from his private bank account, into which account, or into any account, no part of the proceeds of these bonds seems ever to have been deposited.

From these circumstances the conclusion is inevitably forced upon us that the whole of those entries were made for the purpose of covering up the disposition that was made of the $500,000 realized upon the the sale of the bonds of the Broadway and Seventh Avenue Company, and that the necessity for the making of such fictitious entries arose from the fact that the defendant had made some unlawful disposition of the money which he admits having received. The story told by the defendant before the Senate investigating committee is evidently entirely without foundation; it is incredible that a man should, within two or three days, receive in payment of moneys claimed to have been disbursed by him about $400,000 and so soon lose all memory as to its disposition; and we find it impossible to believe that Mr. Foshay, having on hand in cash a large sum of money belonging to the Broadway and Seventh Avenue Railroad Company, if this evidence is true, ever requested the defendant to make these disbursements on behalf of that company out of his own money, repaying the amounts almost immediately in bills. That there was an unlawful use of money in connection with this enterprise was established to the satisfaction of the jury by the evidence of Mr. Fullgraff, and the circumstances corroborating such testimony; and, as we have seen that in view of the suspicious circumstances attending the raising of the $500,000 upon the bonds of the Broadway and Seventh Avenue Company and the attempt to account for the same by false and fraudulent vouchers and entries in the books of the company, some of which vouchers at least, if not all, were furnished by the defendant, an unlawful use must have been made of this money, to which the defendant was a party, and to conceal which these false entries were made, we cannot but conclude that this was the money used to corrupt some of the aldermen in the interest of the Broadway enterprise, and that the defendant was cognizant of and a party to such corruption.

This review of the prominent facts shows conclusively that the

proposition urged by the defendant's counsel that there was no evidence connecting the defendant with the criminal combination of certain members of the board of aldermen is unfounded. There is to be found in the record a large amount of evidence which confirms the conclusions above stated, but which it has been impossible to state within the limits of this concurring opinion as we have been necessarily confined therein to the more salient features of the evidence.

The objection to the admissibility of the testimony of Mr. Pottle as to the interview between the defendant and himself at the Delavan House in 1883 was strongly urged upon the court. That this testimony was properly received for the purpose of showing the intense interest which the defendant had in the enterprise of building a Broadway surface railroad has been demonstrated by Mr. Justice DANIELS in his learned opinion.

There seems, however, to be another ground upon which the admission of this testimony may be defended. The defense throughout the trial of this cause insisted that even if the jury should find that money was paid to Fullgraff by those interested in the enterprise, there was no evidence from which a corrupt purpose might be inferred. That as the money was paid after the services had been rendered, and as Fullgraff had publicly declared his intention to vote for the measure, the jury could not find that it had been paid in pursuance of any previous agreement made for the purpose of influencing the action of the aldermen, but must find that was given as a gratuity. To rebut this proposition and to establish the intent with which the defendant acted in his payments of money to public officials, the prosecution had the right to show other acts of the defendant done by him in furtherance of this same general scheme which were inconsistent with an innocent intent. It is true that it would not have been competent to prove corrupt attempts upon the part of the defendant in furtherance of other enterprises, but the evidence offered related exclusively to a measure necessary to the success of this same enterprise, and one upon which all subsequent action in furtherance of this scheme depended, and without which no move whatever could be made towards the attainment of the desired end. All the acts of a party done in the pursuit of a given end, whether they be lawful or unlawful, form competent proof for the purpose of characterizing the intent with which the

particular act under investigation has been committed. If only one unlawful act is proved, the evidence is necessarily of less weight than if many are established. But the weakness of the evidence forms no ground for its exclusion; it only limits the influence which it should have upon the jury.

In his opinion Mr. Justice Daniels has conclusively shown that the objection to the admission of the evidence of the defendant taken before the senate committee is entirely without foundation, but there are one or two additional considerations to which it may be proper to call attention.

By article 15, section 2 of the Constitution it is provided that any person who shall offer or promise a bribe to an officer, if it shall be received, shall be deemed guilty of a felony and liable to punishment *except as herein provided.* Then follows a provision that no person offering a bribe shall, upon any prosecution of the officer for receiving such bribe, be privileged from testifying in relation thereto, and that he shall not be liable to civil or criminal prosecution therefor, if he shall testify to the giving or offering of such bribe.

By this provision the privilege of refusing to answer is taken from a witness only when called upon to testify in relation to the offering and acceptance of a bribe upon the prosecution of the official bribed, and then only if he has testified to the giving or offering such bribe. A witness is, therefore, privileged from answering any question which may tend to criminate himself in any proceeding of any nature unless he is called upon to testify in a proceeding relating to the prosecution of an officer for receiving a bribe and he has testified to the giving or offering such bribe, and unless he so testifies upon such a prosecution, he is liable to punishment if he has been guilty of the offense of offering a bribe. This being a constitutional provision, even if the legislature attempted to extend the exemption by making it apply to other or different proceedings, such legislation would be null and void as in contravention of the organic law of the land.

It is apparent, however, that the legislature in framing the seventy-ninth section of the Penal Code was simply attempting to carry out these provisions of the Constitution, and that the exemptions inserted in that section were not intended to be and were not of greater scope than those mentioned in the Constitution above

referred to. The words trial, hearing, proceeding or investigation evidently were all intended to refer to judicial proceedings. A trial of a person indicted, a hearing before a committing magistrate, a proceeding or investigation before a grand jury preparatory to an indictment, are all proceedings judicial in their character and directed against some particular person or persons. If there were any doubt as to this being the proper construction to be put upon this word " investigation," it seems to be entirely removed when we consider the sense in which it has been employed in section 4 of the article of the Constitution above referred to.

Section 4 provides that " any district attorney, who shall fail faithfully to prosecute a person charged with the violation in his county of any provision of this article which may come to his knowledge, shall be removed from office by the governor, after due notice and an opportunity of being heard in his defense. The expenses which shall be incurred by any county in *investigating* and prosecuting any charge of bribery or attempting to bribe any person holding office under the laws of this State within such county, or of receiving bribes by any such person in said county, shall be a charge against the State," etc.

This last clause is used in direct connection with that relating to the dereliction in duty of district attorneys, and evidently relates to investigations and prosecutions conducted by the district attorney, who is the only person authorized by law to represent the county in investigations and prosecutions carried on on behalf of the county, and which can only be conducted by means of proceedings before grand juries or committing magistrates. It was this class of investigations, recognized and designated by the Constitution, which the legislature had in mind in framing the provisions of the Penal Code, and which were enacted to carry into effect the requirements of the Constitution, and the exemptions contained in section 79 of the Penal Code were not intended to and do not apply to any other or different proceedings.

Whatever doubts may have existed at the time of the argument as to some of the points raised upon these appeals they have been entirely dissipated by an examination of the record; and the jury, having before them the strong chain of circumstantial evidence presented by this record, were justified, if they gave any credence

to the testimony of Fullgraff that the aldermen had been actually bribed, in coming to the conclusion at which they arrived.

The judgment and orders appealed from should be affirmed

BRADY, J.:

The prosecution, in order to make manifest the charge that the implicated aldermen had combined to vote for the consent given to the Broadway Surface Road for a compensation in money which was furnished by the defendant, or through his instrumentality, with guilty knowledge, proved numerous facts and circumstances after the examination of one of the combination, some of which were also designed to corroborate his statement, weakened as it was by his confession that he had on the same subject committed willful perjury. The defendant complains of this mode of procedure, and save the assertion that his privileges and the protection afforded by the Constitution were invaded and violated, it forms the chief feature of his appeal. Justice DANIELS has discussed these points, as well as others, and disposed of them on principle and authority adversely to the defendant, and the other members of the court concur in the views expressed by him. It may not be improper to add that the various acts, circumstances, incidents and events arrayed by the people in relation to the combination, and the defendant's participation in the scheme it embraced, were clearly admissible as indicated by the text books and authorities illustrative of the different elements which may be employed to establish the commission of such offenses. In all accusations, therefore, of persons who must act in concert to accomplish the object in view, whatever is done by either in furtherance of it, and, indeed, whatever is done by either after the illegal act is performed, tending to prove the criminal compact or its consummation is admissible. And as such unions are secretly formed for obvious reasons, it follows that they may not be shown to have existed except by proof of facts and circumstances which, isolated, would seem of little value — indeed, insignificant—but which, when grouped, present an imposing demonstration.

The rules of evidence, as a consequence, necessarily expand to receive such proof, and, therefore, even remote acts and incidents, whether directly or collaterally affecting the question, but which tend to establish the imputed crime, are admissible, and the con-

sideration of the subject by numerous tribunals has led to the adoption of rules in accordance with the views thus expressed. The prosecution have resorted herein to such evidence, not only to show the unlawful combination, but to establish the guilt of the defendant; and hence a multitude of facts and circumstances which, though when separately considered are seemingly unimportant, become momentous when connected with others, the whole forming a compact mass — a legal mosaic, impressive, commanding, convincing. The presentation thus made may well be regarded, therefore, as satisfactory evidence of the combination and of the guilt of the defendant, and for this reason the learned justice presiding at the trial would not have been justified in withholding their consideration from the jury. It was his province and duty to determine whether there was sufficient evidence to submit to the jury the issue whether the aldermen named had, in fact, been bribed; and if yea, whether the testimony relating to the defendant's guilt, as charged, was sufficient to require the submission of that issue to the jury. The court is unanimous that, on both of these questions, the presiding justice in the court below exercised his judgment properly. If, however, during the investigation which he conducted, some fact, incident or circumstance was erroneously admitted, nevertheless, as shown by Justice DANIELS, unless substantial injustice was done, the verdict should not for that reason be disturbed. Now, a mere error in the receipt or exclusion of evidence, which gives rise to a technical objection, must be disregarded. Some substantial right or benefit must appear to have been violated or withheld. (Crim. Code, § 542.) This statutory enactment dissipates some rules of review which heretofore existed, and perhaps facilitates the disposition of appeals in criminal cases.

BARTLETT, J.:

I agree with the other members of the court in their concurrence in the opinion of Mr. Justice DANIELS. I think the evidence for the prosecution required the submission of the case to the jury, and that the trial was conducted without any error detrimental to the rights of the defendant.

Judgment, and the intermediate orders included in the appeal, affirmed.